UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                              Chapter 11
                                                    Case No. 14-58049
RnD Engineering, LLC, et al.,[1]                    (Jointly Administered)
                                                    Hon. Phillip J. Shefferly
        Debtors.
_____/

Nagel Precision Inc.,                               Adversary Proceeding
                                                    No. 15-4189-PJS
        Plaintiff,

v.

RnD Engineering, LLC, and
Richalin Kamtchouang Digue,

        Defendants.
_____/


**OPINION AFTER TRIAL (1) ALLOWING CLAIMS; (2) DETERMINING
NONDISCHARGEABLE DEBT; AND (3) DENYING INJUNCTIVE RELIEF**


**Introduction**

Nagel Precision Inc. ("Nagel") designs and manufactures machines used in the automotive

and other industries.  Nagel brought this adversary proceeding against two Chapter 11 debtors, one

of them an individual, Richalin Digue ("Digue"), and the other a company owned by Digue, known

as RnD Engineering, LLC ("RnD").  All of Nagel's claims against them arise from the fact that

Digue at one time worked as a project manager for Nagel, but now owns his own business, RnD, that

directly competes with Nagel.  It took Nagel some time to learn about Digue's competing business,

_____

[1] The Debtors in these jointly administered cases are: RnD Engineering, LLC (case
no. 14-58049), and Richalin Kamtchouang Digue (case no. 14-58053).

but when it did, Nagel sued Digue and RnD in state court, claiming that they had misappropriated

Nagel's trade secrets, tortiously interfered with Nagel's business relationships, breached fiduciary

duties owed to Nagel, and otherwise engaged in wrongful conduct to the detriment of Nagel.

Just before the start of trial in the state court, Digue and RnD ("Debtors") each filed a

Chapter 11 petition. Nagel's claims against the Debtors, the Debtors' objections to those claims,

and Nagel's request to except its claims from Digue's discharge, were all tried together in this

adversary proceeding. For the reasons set forth in this opinion, the Court allows Nagel a claim

against Digue in the amount of $564,503.16, and a claim against RnD in the amount of $564,503.16.

Further, the Court holds that Nagel's allowed claim against Digue is nondischargeable in Digue's

case.

## Jurisdiction

The United States District Court for the Eastern District of Michigan has jurisdiction over

this adversary proceeding pursuant to 28 U.S.C. § 1334(a) and (b). Pursuant to 28 U.S.C. § 157(a),

each district court is authorized to refer to the bankruptcy judges for the district any and all

proceedings arising under Title 11 or arising in or related to a case under Title 11. The District

Court for the Eastern District of Michigan has referred this adversary proceeding to the Bankruptcy

Court for the Eastern District of Michigan by Local District Court Rule 83.50(a). Pursuant to

28 U.S.C. § 157(b)(2)(B), the allowance or disallowance of Nagel's claims against the Debtors is

a core proceeding. Pursuant to 28 U.S.C. § 157(b)(2)(I), the determination as to whether Nagel's

claims are nondischargeable in Digue's case is also a core proceeding. Neither the allowance of

Nagel's claims nor the determination of nondischargeability of Nagel's claims against Digue are the

type of proceeding addressed by the United States Supreme Court in Stern v. Marshall, __ U.S. __,

131 S. Ct. 2594 (2011) that implicates concerns over this Court's constitutional authority to adjudicate such proceedings. Further, all of the parties to this adversary proceeding have expressly consented in writing to the Court entering a final order or judgment in this adversary proceeding. See Wellness Int'l Network, Ltd. v. Sharif, __ U.S. __, 135 S. Ct. 1932, 1944 (2015) (holding that "allowing Article I adjudicators to decide claims submitted to them by consent does not offend the separation of powers so long as Article III courts retain supervisory authority over the process"). The Court concludes that it has both the statutory jurisdiction and the constitutional authority to enter a final judgment and order with respect to all matters at issue in this adversary proceeding.

### Procedural History

On June 12, 2013, Nagel filed suit against Digue and RnD in the Washtenaw County Circuit Court in the State of Michigan ("State Court Case"). The complaint in the State Court Case contained four counts: count I alleged misappropriation of trade secrets in violation of the Michigan Uniform Trade Secrets Act, Michigan Compiled Laws Annotated § 445.1901 et seq. ("MUTSA"); count II alleged intentional interference with business relations; count III alleged breach of fiduciary duty; and count IV alleged unjust enrichment. The complaint sought a money judgment of $2,132,889.03 against both Digue and RnD, and a permanent injunction prohibiting Digue and RnD from using the misappropriated trade secrets. The parties took extensive discovery and vigorously litigated the State Court Case. The State Court Case was scheduled for trial in December, 2014. The trial was stayed when Digue and RnD filed their Chapter 11 petitions on November 20, 2014.

On December 22, 2014, the Court entered an order directing the joint administration of the two Chapter 11 cases. On January 2, 2015, Nagel filed a proof of claim in the amount of $2,132,889.03 in each bankruptcy case. On February 27, 2015, Nagel filed this adversary

proceeding ("Adversary Proceeding"). Nagel's complaint in the Adversary Proceeding contains the same four counts set forth by Nagel in its complaint in the State Court Case, and likewise seeks both monetary and injunctive relief. In addition, Nagel's complaint in the Adversary Proceeding seeks a determination that Nagel's claims against Digue are nondischargeable under § 523(a)(2), (4) and (6) of the Bankruptcy Code.

On May 14, 2015, the Debtors filed objections to Nagel's proofs of claims in both bankruptcy cases. After conferring with the parties, and based on the parties' express agreement, the Court entered an order providing for the Debtors' objections to Nagel's proofs of claims to also be adjudicated as part of the Adversary Proceeding.

On September 16, 2015, the trial began. The trial took nine days. Nagel called four witnesses: Sanjai Keshavan ("Keshavan"), a project manager at Nagel; Digue; Frederick C. Kucklick ("Kucklick"), an expert witness; and Thomas McNamara ("McNamara"), the director of human resources and financing at Nagel. The Court received into evidence Nagel's exhibits 1-12, 14-23, 26-46, 48-60, 63-66, 68-74, 76-78, 80, 82-85, 88-91, 94-95, 97, 108-109, 112, 122, 124, 138-139, 146, 149-151, 154, 157-161, 163, 165-167, and 178-183.[2] The Debtors called three witnesses: Melville Evans ("Evans"), a former employee of Nagel who also performed services for

---

[2] At the close of Nagel's proofs, the Debtors made an oral motion for judgment in their favor. The Court took the motion under advisement. The Debtors did not cite to any rule in support of their motion. The Court construes it as a motion under Rule 52(c), incorporated by Fed. R. Bankr. P. 7052. See Delay v. Rosenthal Collins Group, LLC, no. 2:07-CV-568, 2012 WL 6725595, at *1 (S.D. Ohio Dec. 27, 2012) (construing a motion for directed verdict as a motion under Rule 52(c)); see also Buckstop Lure Co. v. Trost (In re Trost), 164 B.R. 740, 749 n.9 (Bankr. W.D. Mich. 1994) (noting that "[p]ursuant to the Committee Notes to the 1991 amendments to Rule 52(c), Rule 52(c) parallels Rule 50(a) but is applicable to nonjury trials"). Having now had the opportunity to examine all of Nagel's evidence, the Court finds that Nagel adduced enough evidence to defeat the motion and therefore denies it.

-4-

RnD; David Eby ("Eby"), an expert witness; and Digue. The Court received into evidence the Debtors' exhibits A-B, D, F-T, V, W-Y, AA, CC, KK, and MM. On November 20, 2015, the Court heard closing arguments. On December 23, 2015, the parties filed post-trial briefs. This opinion represents the Court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052.

### Facts

The Court makes the following findings of fact from the record made at the trial.[3]

Nagel is a Delaware corporation with its principal place of business in Ann Arbor, Michigan. Nagel designs and manufactures various types of machines for automotive and other industries. The controversy in this case centers on what are known as superfinishing machines. Superfinishing is a type of sanding process that removes abrasions and creates a super smooth, polished surface on a part. The superfinishing process significantly improves the life and performance of the part. Superfinishing is a niche market, with only a handful of companies globally, including Nagel and RnD, that design and build these machines. Nagel's customers typically are original equipment manufacturers ("OEMs") and tier one suppliers that build transmissions and camshafts.

The specific type of superfinishing machine at issue in this case is referred to as a tape finishing machine. The function of a tape finishing machine is to polish the outside surface of a work piece (for example, an automotive part such as a camshaft) by advancing abrasive tape to present unused tape to the work surface while the work piece is turned. This advancement of the

---

[3] The evidentiary record made at the trial is very extensive. The findings set forth in this opinion consist only of those facts that are necessary to dispose of the issues in this adversary proceeding. Those facts adduced in the record that are extraneous or irrelevant to the disposition of the issues in this adversary proceeding are not mentioned in the opinion. That does not mean that the Court did not consider them. It did. Also, in the interest of brevity, the opinion does not cite to a specific excerpt of testimony or specific exhibit to support every finding of fact, but does do so in those instances where the Court considers it useful.

abrasive tape is also known in the industry as indexing or actuation.  The pressure, frequency and amplitude of the oscillation of the work piece, as well as the indexing of the tape, are carefully controlled to ensure even polishing.

Digue is a native of Cameroon who studied electrical and computer engineering after coming to the United States in 1992.  Nagel first hired Digue as an electrical engineer in 1997.  When he started work at Nagel, Digue signed an acknowledgment that he received a copy of Nagel's employee handbook (ex. 1).  The acknowledgment stated that he would "agree to the Company's rules, regulations and conditions."  The employee handbook described various types of conduct that Nagel "considers inappropriate," including "failing to maintain the confidentiality of Nagel, customer, or client information."  Consistent with its treatment of its other employees at the time, Nagel did not ask Digue to sign a non-disclosure agreement or a non-compete agreement.  Digue worked at Nagel as an electrical engineer until 1999, but then left to work for various other companies during the next several years.

In 2004, Nagel contacted Digue to see if he was interested in coming back as an electrical engineer.  Digue decided to come back to Nagel, but in a somewhat different relationship.  Although Digue had previously been an employee during his first stint at Nagel, Digue now requested that he be treated as an independent contractor.  Digue made this request because he wished to "remain independent."  Digue requested that the checks issued by Nagel for his services now be made payable to "Richalin Digue, LLC," a limited liability company that Digue formed on February 17,

-6-

2004 (ex. 4).[4]  No one at Nagel asked Digue why he wanted to be paid in this way, but Nagel agreed to do so.

During the time he worked for Nagel as an independent contractor, Digue was treated the same as a Nagel employee in some respects but differently in other respects.  Like Nagel employees, Digue had a desk and an office at Nagel, a laptop computer provided by Nagel, and business cards provided by Nagel.  Like Nagel employees, Digue was not asked to sign a non-disclosure agreement or a non-compete agreement.  However, unlike Nagel employees, Digue did not receive any health benefits or life insurance from Nagel as an independent contractor.  Further, in contrast to when he first came to work as an employee of Nagel, Digue was not even asked to acknowledge receipt of Nagel's employee handbook when he returned to Nagel as an independent contractor.

Digue worked at Nagel as an independent contractor in the position of electrical engineer until 2007.  When Keshavan, one of Nagel's several project managers for superfinishing machines, left Nagel in 2007, Digue requested that he be given his position.  Project managers at Nagel are responsible for marketing Nagel machines.  They work directly with Nagel's customers.  Project managers promote Nagel products and pursue sales leads to obtain what are known as "RFQs."  An RFQ is a customer request for quote (sometimes referred to as a proposal) on a particular project.  The RFQ is crucial in the sales process because it identifies a potential sale.  When a Nagel project manager receives an RFQ, they log it into Nagel's central database.  If the project manager decides to move forward with a quote, the project manager prepares the quote and submits it to Nagel's

---

[4] Some of Nagel's exhibits contain multiple documents.  For example, exhibit 4 contains three different certificates filed with the State of Michigan from 2004 to 2011.  As a result, a citation in this opinion to an exhibit number means that the referenced document is included in that exhibit number, but may not be the only document included in that exhibit number.

management for approval.  If approved, the project manager submits the quote to the customer.  If the quote is accepted, the customer issues a purchase order.  After Nagel obtains a purchase order, the project manager stays involved until the machine is delivered, and sometimes even after that, serving as the contact person for any post-delivery issues or problems.  A project manager at Nagel is the "eyes and ears" for Nagel who oversees the design and manufacture of a superfinishing machine from "cradle to grave."

Despite the fact that Digue did not have much sales experience, Nagel made Digue a project manager in 2007.  Even though all of Nagel's other project managers were employees, Nagel permitted Digue to remain an independent contractor.  Digue held the position of project manager for Nagel for the duration of the time that he worked for Nagel.

On November 18, 2011, Digue gave two weeks' notice to Rolf Bochsler, the president of Nagel, that he was resigning and moving to Houston, Texas.  On December 2, 2011, Digue's last day at Nagel, he left only his laptop, and was not asked to leave anything else.  Nagel did not conduct an exit interview because Digue was an independent contractor, not an employee. Keshavan, who was now back working again for Nagel, took over Digue's responsibilities as project manager.  Digue provided him with a list of the projects he was working on.

While he was at Nagel, Digue was well paid.  From the time he came back to Nagel in February, 2004 until he left in December, 2011, Digue worked full time for Nagel, over 40 hours per week, and was paid on an hourly basis upon submission of weekly time sheets and invoices. Nagel's records (ex. 2) show that Nagel wrote all checks for Digue's work to Richalin Digue, LLC. In 2004, Nagel paid $91,085.50.  That went up to $143,809.68 in 2005.  After that, Nagel paid over $150,000.00 annually for Digue's remaining years at Nagel, with a high of $189,699.54 in 2010.

-8-

Altogether, Nagel paid Richalin Digue, LLC over $1.2 million for Digue's services from 2004 through 2011. This was Digue's only source of income during these years.

After Digue resigned, Nagel and Digue had no contact with one another until January, 2013, when Keshavan happened to run into Digue at a Chicago airport. During the course of their conversation, Digue explained that he had not moved to Houston, as he had told Nagel when he resigned. Instead, he was operating RnD in Livonia, Michigan. This news prompted Keshavan and McNamara to go to RnD's website to learn more about RnD's business. They were immediately concerned because the website contained testimonials about RnD from Nagel's customers. Over the next several months, Nagel learned from various sources that not only was Digue operating RnD in January, 2013 when Keshavan spoke to Digue, but in fact Digue had been operating RnD for some time. Nagel's investigation eventually revealed that Digue had even been secretly operating RnD while Digue was being paid to work full time for Nagel.

It turns out that Digue had been planning for years to have his limited liability company expand its business activities beyond the services that Digue was providing for Nagel. On October 19, 2006, Digue filed a certificate (ex. 4) of assumed name with the state of Michigan for Richalin Digue, LLC to begin transacting business as "RnD Engineering." Digue filed the certificate because he was already "thinking about soliciting and expanding the service that I was offering and the customers I was dealing with." At the time, Digue did not mention the assumed name to Nagel, and Nagel continued to issue checks for Digue's services to Richalin Digue, LLC.

While Digue was still working as a project manager for Nagel, and unbeknownst to Nagel, Digue began acting on his desire to expand RnD's business. On October 20, 2010, Digue sent an exploratory email (ex. 8) from his Nagel email address to Saint-Gobain, a manufacturing company

-9-

and Nagel customer, explaining that he was interested in a "target market" for tier two and three suppliers in the United States and tier one suppliers in Mexico. Digue's email stated that he was "confident that I can open up a new market in this area" and requested information regarding terms and conditions and pricing approach. In response, Saint-Gobain, sent an email (ex. 8) on October 20, 2010 to Digue stating that:

> Rich, you are moving very fast here, we - I'm confused w/RnD engineering versus Nagel . . . can you explain? We are very specific on who we add as far as distribution and it wouldn't be my decision if RnD is not a machine tool builder - but I can certainly lead you to the right person. In the meantime, if you can give me a quick blurb on RnD this would be a good start.

Soon after, on November 22, 2010, Digue obtained business cards (ex. 9) identifying him as the "manager" of RnD and stating that RnD's "specialty is to increase your profit margin by optimizing your process. This includes: polishing, superfinishing, honing, grinding."

Throughout this time, Digue did not mention to Nagel that RnD was expanding its business, that he had sent the exploratory email to one of Nagel's customers, or that he had obtained business cards for RnD describing the nature and scope of its business.

By spring, 2011, Digue was taking more tangible and bolder steps to launch RnD's business. On May 12, 2011, Digue sent an email (ex. 15) from his Nagel email address to his RnD email, attaching an Excel spreadsheet (ex. 157), which contained information exported from a Nagel password protected Microsoft Outlook file. The file contained approximately 1,200 entries of contact information for over 200 individuals, including the names of Nagel's existing customers, potential customers, contact individuals for such customers, notes about prior customer experiences, notes about future customer programs, and various other information that had been assembled over time to help market and sell Nagel products. Keshavan originally created this file when he was

a project manager for Nagel, and had input approximately 200 of the entries in it. Other Nagel project managers had also added some entries, but Digue input most of the entries in this file after he took over Keshavan's position as project manager. Although Digue had added some personal information in the file, for the most part the file contained information assembled for the purpose of promoting and marketing the sale of Nagel machines. Digue did not request permission from anyone at Nagel to send the file to his RnD email address, nor did he tell anyone at Nagel that he had done so.

Around the same time, Digue began directly soliciting business for RnD from Nagel customers. In March, 2011, Digue traveled to Mexico, ostensibly to give a presentation for Nagel to one of its customers, GKN Celaya. A series of emails (exs. 10 and 11) discussed the specific arrangements. The presentation was intended to promote Nagel machines, sales and production facilities. Following his trip, Digue invoiced Nagel for his travel expenses (ex. 12), which Nagel paid. Digue's presentation to GKN Celaya was successful, although not in the way that Nagel intended.

On May 4, 2011, GKN Celaya sent Digue an email (ex. 14) at his Nagel email address requesting "two polishing machines." Despite the fact that Digue was working as a project manager for Nagel, and had sought the RFQ from GKN Celaya for Nagel, Digue did not enter the RFQ in the RFQ log at Nagel. Instead, on June 22, 2011, Digue submitted a quote (ex. 19) to GKN Celaya for two polishing machines on behalf of RnD, not Nagel. The quote basically copied the format used by Nagel for its quotes, and used Nagel's terminology, except that it was on RnD's letterhead with RnD's logo. With one exception, the photographs of superfinishing machines contained in the quote were all photographs of Nagel superfinishing machines. Even though RnD had never designed or

manufactured a superfinishing machine, and Digue himself was not a mechanical engineer, RnD's quote trumpeted "our experience building similar machines for Parker, Linamar Driveline, Linamar ILSA, Visteon, and others." RnD's quote was successful. On July 28, 2011, GKN Celaya issued a purchase order (ex. 22) to RnD for two superfinishing machines in the total amount of $691,460.00. Digue did not tell Nagel about GKN Celaya's RFQ, RnD's quote or GKN Celaya's purchase order.

Although Digue was successful in steering GKN Celaya business from Nagel to RnD, Digue ran into a problem in filling the purchase order. To view the purchase order, Digue needed a user name and password to access GKN's supplier web portal. On July 29, 2011, Digue sent an email (ex. 21) to GKN requesting a user name and password. On the same day, GKN sent a response (ex. 23) to Digue, informing him that GKN had created an account for him on GKN's supplier web portal and had assigned RnD a user name and password. The supplier codes that the email assigned to RnD were Nagel's supplier codes. Digue had now succeeded in making RnD a supplier for GKN by obtaining the supplier codes that GKN had given to Nagel.

Digue had solved his problem of how to view the purchase order that RnD received, but his diversion of Nagel's supplier codes soon created a different problem for him. In September, 2011, McNamara brought to Digue's attention that there was an outstanding invoice (ex. 36) in the amount of $20,975.00 owing by GKN Driveline to Nagel for purchase order number EC46094 (ex. 6),which had previously been issued by GKN Driveline to Nagel. When Digue looked into it, he found out that the reason why the invoice was not paid was because the invoice had been issued by Nagel, but the supplier codes in GKN's system had been changed to RnD at Digue's request. GKN Driveline responded to Digue by email (ex. 36) on September 9, 2011 explaining that Digue now needed to

send an invoice from RnD so that GKN could process payment. Rather than tell Nagel about this problem, on September 30, 2011, Digue created and sent a fictitious RnD invoice (ex. 38) to GKN Driveline in the amount of $20,975.00. The fictitious RnD invoice had all the same information as the original Nagel invoice, except that it was issued as an RnD invoice, with RnD's logo, rather than Nagel's logo. GKN Driveline paid the fictitious RnD invoice on November 15, 2011 by means of a check to RnD, which RnD then deposited in its bank account at Chase Bank (ex. 40). Digue still did not mention any of this to Nagel.

RnD kept the funds from GKN Driveline for a month before remitting them to Nagel. On December 15, 2011, Digue arranged for RnD to reimburse Nagel for the $20,975.00 that had been paid to RnD on the fictitious RnD invoice, but Digue did so in a secretive way so as not to alert Nagel to what he had done. Rather than have RnD cut a check directly to Nagel, Digue had RnD withdraw $20,975.00 from its bank account on December 15, 2011 and use the funds to purchase a cashier's check (ex. 41) made payable to Nagel. The cashier's check contained no reference to RnD, but instead designated the "remitter" as "GKN POH #EC46094," which was the number of the purchase order (ex. 6) that GKN Driveline had issued to Nagel on November 1, 2010. By disguising the payment to make it look like the payment was coming from GKN Driveline and not from RnD, Digue was successful in hiding the fact that Digue had caused GKN to assign Nagel's supplier codes to RnD and that GKN Driveline had paid RnD on a fictitious RnD invoice for a purchase order issued by GKN Driveline to Nagel. This also enabled Digue to hide the fact that RnD held Nagel's funds in RnD's bank account for a month after RnD received the payment from GKN Driveline.

-13-

During the same time frame, and while still being paid for full time work by Nagel, Digue solicited more work for RnD directly from other Nagel customers. In May, 2011, Digue traveled to Mexico to visit with representatives of TRW Automotive, another Nagel customer. Digue sent Nagel an invoice (ex. 17) for the cost of the trip, and Nagel paid it on June 2, 2011. Following the meeting, Digue sent an email (ex. 16) to TRW from his Nagel email account, thanking TRW for "the opportunity to quote a new process to further improve the quality of your parts." On June 6, 2011, Digue sent TRW a quote (ex. 18) from RnD to design and manufacture a machine for a valve project. The quote was on RnD's letterhead and makes no mention of Nagel. Digue did not inform Nagel that he submitted this quote.

In some instances, Digue even prepared competing quotes on behalf of both RnD and Nagel in response to the same RFQ. On June 30, 2011, Digue submitted a quote (ex. 29) on behalf of RnD to another one of Nagel's customers, Linamar Engicom. RnD's quote to Linamar Engicom was for a deburring machine for $199,220.00. On September 22, 2011, Digue submitted a quote (ex. 30) on behalf of Nagel to Linamar Engicom for the very same machine. But the Nagel quote was for $207,120.00, higher than the RnD quote. Not surprisingly, Linamar Engicom accepted RnD's lower quote and, on September 28, 2011, issued a purchase order (ex. 31) to RnD for the deburring machine. Despite still being paid by Nagel to work full time for Nagel, Digue did not tell Nagel either that he had submitted a competing quote by RnD or that Linamar Engicom had issued a purchase order to RnD.

Another example of Digue submitting competing quotes on behalf of both Nagel and RnD involved Linamar ILSA, another Nagel customer. On September 7, 2011, Digue submitted a proposal (ex. 42) on behalf of RnD to Linamar ILSA for a superfinishing machine for a price of

-14-

$299,900.00. On September 24, 2011, Digue submitted a competing proposal (ex. 44) on behalf of Nagel to Linamar ILSA for the very same machine. However, this second proposal was for a quoted price of $372,850.00, approximately 24% higher than the proposal he submitted on behalf of RnD. Digue did not tell Nagel that he submitted a competing proposal on behalf of RnD, or that the proposal that he submitted on behalf of RnD significantly underbid the proposal he submitted on behalf of Nagel.

There were numerous other instances where Digue received an RFQ at Nagel, hid it from Nagel, and then issued a proposal from RnD in response to the RFQ: on September 1, 2011, Digue submitted a proposal (ex. 26) by RnD to GKN Driveline; on September 6, 2011, Digue submitted a proposal (ex. 48) by RnD to Linamar; on October 7, 2011, Digue submitted a proposal (ex. 46) by RnD to Linamar; and on November 29, 2011, Digue submitted a proposal (ex. 57) by RnD to ThyssenKrupp. Digue submitted all of these RnD proposals to Nagel customers in response to RFQs issued to Nagel, while Digue was working full time for Nagel. Some of these efforts were successful in obtaining purchase orders for RnD. Others were not. But regardless of whether Digue's efforts were successful or not, Digue was brazenly diverting RFQs from Nagel during this time, copying Nagel's proposals, using the same text, and using photographs of Nagel machines in the proposals he made on behalf of RnD.

When Digue left Nagel, he notified some Nagel customers that Keshavan would be taking over his Nagel projects, but he did not give that notice to those Nagel customers whom he had been soliciting on behalf of RnD. After investigating archived email records, McNamara later determined that Digue did not send notices to GKN Celaya, GKN Alamance, Linamar Engicom, Linamar ILSA and Parker. Instead, Digue continued up to his last day at Nagel to steer business away from Nagel

to RnD. On November 25, 2011, Digue sent an email (ex. 57) to ThyssenKrupp, providing his "new contact information" at RnD, with an address on Globe Street in Livonia, Michigan, and inquiring about the "VW prototypes." The November 28, 2011 response from ThyssenKrupp asked if Digue was "wanting to polish the VW Brazil prototypes under RnD Engineering" and whether he had the equipment to do the job. Digue responded on November 29, 2011 with a proposal for finishing the prototypes and assuring that the "R&D machine is being assembled. It will be ready on time to complete this job."

Meanwhile, as Digue was covertly pursuing Nagel's customers to obtain business for RnD, he was also taking formal steps to set up RnD's business for when he left Nagel. Although Digue had reserved the assumed name "RnD Engineering" since 2006, he now formally changed the name of his limited liability company. On November 1, 2011, Digue filed a certificate (ex. 4) amending the articles of organization for Richalin Digue, LLC to change its name to "RnD Engineering, LLC." Shortly after that, on November 17, 2011, at virtually the same time that Digue told Nagel that he was resigning to move to Houston, Texas, Digue signed a 39 month lease (ex. 50) for RnD to rent business premises at the Globe Street address in Livonia, Michigan.

Digue was also working to line up financing for RnD. In support of an application for a line of credit, Digue sent an email (ex. 51) on November 15, 2011 to First Independence Bank. Attached to the email is a November 15, 2011 letter from RnD to First Independence Bank with the subject stated as "Request for a Line of Credit in the amount of $150,000.00." The letter reads as follows:

> Dear Sir,
>
> RnD Engineering is writing this letter to establish clarity in the financial and overview of the Purchased Orders that have been confirmed at this time and the payment schedule for such.

RnD is proud to have received confirmed orders totaling $1.182 Million till [sic] date.

These orders are placed by (3) companies all in Mexico:

| | | | |
|---|---|---|---|
| GKN Driveline: | (2) PO | $498K (received) | $193K (been processed) |
| Linamar Engicom: | (1) PO | $191K (received) | |
| Linamar ILSA: | (1) PO | $299K (been processed) | |

All of the purchase orders described in this letter are purchase orders that Digue had obtained for RnD from RFQs sent to Nagel while Digue was working for and being paid by Nagel. In support of RnD's loan application, Digue also prepared a cash flow projection (ex. 53) that projected RnD's sales to be $1,590,067.00 in 2011, $10,000,000.00 in 2012, and $20,000,000.00 in 2013. The projections for 2011 were all based on quotes that Digue had submitted on behalf of RnD to Nagel customers during 2011.

During the same time frame, Digue was also trying to find an engineer for RnD, since Digue himself was not a mechanical engineer and had never designed or manufactured a superfinishing machine. Although the precise date is not entirely clear from the record, at some point in autumn, 2011, Digue approached Dan Smarch ("Smarch"), a mechanical engineer at Nagel who had experience in designing superfinishing machines. Digue asked if he was interested in joining Digue at RnD. Smarch declined. Digue then contacted Evans, a mechanical engineer who had worked at Nagel in the past and was now laid off. In October, 2011, RnD hired Evans to design machines. Digue did not tell Evans that he was still being paid to work full time for Nagel. For the first couple of months, Evans worked from home. By Christmas, Evans had moved into an office in the building that RnD had leased in Livonia and became a full time employee of RnD.

-17-

The first machine designed and built by RnD was a deburring machine.  Around the end of 2011 or the beginning of 2012, RnD began developing its first superfinishing tape machine.  The evidence in the record is conflicting regarding precisely when the design process began for this machine, and how much of it was taken by RnD from Nagel's design.[5]  In any event, while the precise date of the design of the machine is unclear, what is clear is that this was a superfinishing machine built in response to a purchase order (ex. 32) that RnD received from GKN Celaya on October 4, 2011, while Digue was still working for Nagel.  And regardless of whether Evans first began designing a superfinishing machine for RnD in late 2011 or early 2012, it is undisputed that this was the first one that he had ever worked on.  To help him design it, Digue told him what it should look like and what improvements he wanted over superfinishing machines he had seen in the past.  Digue also provided Evans with a Nagel assembly drawing of a tape management arm.  Evans eventually altered this design to address what he believed to be an inefficiency in the tape actuation mechanism.  The design for the first superfinishing machine actually built by RnD included Evans's revised tape actuation mechanism.

For the first few months after he left Nagel, Digue handled all of the sales for RnD, directly pursuing sales from Nagel's customers.  In April, 2012, RnD hired Steve Kocsis ("Kocsis") as a sales manager to help grow RnD's business.  Kocsis had many years of experience as a salesperson in the industry.  Kocsis helped RnD obtain some new customers that were not previously Nagel customers.  Among them were Dayco and Delta Gear.  RnD also bid on projects with other potential

---

[5] The parties devoted considerable attention at trial to the time line of the development of RnD's first superfinishing machine and the extent to which it did or did not incorporate Nagel's alleged trade secret.  For the reasons explained below, these details are not relevant to the Court's decision.

customers who were not Nagel customers, such as MFC Netform. However, RnD also continued to bid on projects with companies that had been Nagel customers.

During spring, 2013, as Nagel continued to learn more about RnD, it became increasingly alarmed about Digue's efforts to divert work from Nagel to RnD while Digue had been working for Nagel. Around this time, Keshavan was at a trade show when one of Nagel's competitors informed him that it had lost a couple of jobs to RnD from two of Nagel's customers, Linamar and GKN. Keshavan's investigation into these jobs led him to conclude that Digue had been sowing confusion in these customers over whether Nagel was even still in the business of designing and manufacturing superfinishing machines.

In May, 2013, Keshavan received an email (ex. 71) from Nagel's sales representative in Mexico indicating that GKN Celaya had, "because of lack of communication, [] purchased 2 more polishers to the same person that sold them the first one under some kind of strange arguments [sic]." GKN Celaya also requested an in-person meeting with Nagel to discuss the matter. Keshavan went to Mexico to meet with representatives of GKN Celaya where he was informed that GKN Celaya had been told that Nagel had exited the superfinishing business and that they now had to purchase equipment through Digue if they wanted Nagel polishing equipment. After Keshavan's visit, a representative of GKN Celaya sent him an email (ex. 72) thanking him for coming and saying that he was "glad to hear that we can get the support form [sic] NAGEL to fix and take actions against this fraud." Keshavan concluded that similar confusion was created with employees at GKN Alamance, the North American branch of GKN Driveline. To mitigate the confusion, Keshavan had to send an email (ex. 167) clarifying that Nagel was still active in the superfinishing business and that it was not associated with Digue.

Nagel also learned of confusion with other customers. On May 2, 2013, Keshavan received an email (ex. 179) sent by Nagel customer ThyssenKrupp. The email was addressed to Digue at his former email address at Nagel. Because Digue was no longer working for RnD, emails at that address were now forwarded to Keshavan. The email referred to an "open PO" that Nagel did not recognize. By now, it had become clear to Nagel that the work that Digue had diverted from Nagel was extensive and that the problems that Digue had created for Nagel were more serious than Nagel initially may have thought. Even now, Nagel still does not have a complete understanding of how much confusion Digue created with Nagel's customers.

Nagel and RnD both continue to operate. The record is silent as to the current size of either Nagel's business or RnD's business. No profit and loss statements or balance sheets for either company were introduced into evidence. But there is some evidence to show the magnitude of RnD's business, and how much of that business was derived from Nagel customers. All told, from the time it began its business in 2011, through June, 2015, RnD either sold, or obtained purchase orders or letters of intent, for machines in the aggregate amount of $4.6 million (ex. 182). Of these sales, purchase orders or letters of intent, approximately $4.3 million represents business from ten Nagel customers and approximately $300,000.00 represents business from other customers.

### Issues

The first issue is whether Nagel has an allowed claim against the Debtors. That encompasses both the various theories of liability in Nagel's complaint and the Debtors' objections to Nagel's proofs of claim. If the Court holds that Nagel does have an allowed claim against the Debtors, the second issue is the amount of the claim to be allowed in each bankruptcy case. If the Court holds that Nagel has an allowed claim against Digue, the third issue is whether such claim is excepted

from Digue's discharge under § 523(a) of the Bankruptcy Code. The last issue is whether Nagel is entitled to injunctive relief.

### Count I – MUTSA

In count I of its complaint, Nagel alleges that the Debtors misappropriated Nagel's trade secrets in violation of MUTSA.

MUTSA § 445.1902(d) defines a "trade secret" as

information, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:

(I)     Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(ii)    Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"Misappropriation" is defined in § 445.1902(b)(I) as either "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" or "[d]isclosure or use of a trade secret of another without express or implied consent" coupled with other conduct.

Nagel alleges that the Debtors misappropriated two basic types of trade secrets in this case. First, Nagel alleges that its unique combination of three elements in its design of superfinishing machines is a trade secret; and second, that its customer sales process is a trade secret. The Debtors argue that neither of these qualify as trade secrets under MUTSA, but even if they do, the Debtors have not misappropriated them. The Court will deal with the two types of information separately, beginning with Nagel's three-element design.

-21-

## 1. Nagel's three-element design

Kucklick, Nagel's expert witness, explained what makes up Nagel's three-element design. Kucklick is a mechanical engineer who has spent decades in the design, engineering, manufacturing and sales of heavy machinery. Kucklick was the founder, owner and operator of Hess Engineering, Inc. ("Hess"), a company that designed and manufactured heavy machinery for OEMs and tier one suppliers. At its height, Hess had 500 employees in multiple locations. Since selling Hess in 1998, Kucklick has been employed as the president and owner of IMT Consulting, Inc., where he serves as a consultant and expert witness in matters involving the design, manufacture and sale of heavy machinery. During the trial, the Court granted Nagel's oral motion to qualify Kucklick as an expert witness in the field of mechanical engineering with expertise in the sales, marketing, design and manufacture of machine tools for use in heavy industrial machinery, including the existence, value and preservation of trade secrets in that industry. The Court admitted his report (ex. 163) into evidence, and Kucklick testified extensively.

Kucklick explained that Nagel uses three design elements, which in combination constitute a trade secret. The first element is a one sided design. What this means is that Nagel mounts all of the major components of its superfinishing machines on one side of a single plate. The second element is a one way clutch. By only turning one way, the clutch allows the gears in the superfinishing machine to advance the abrasive tape one way. This prevents the gears from backing up and creating slack in the tape and ensures that each work piece is polished with fresh tape. The third element is a tape actuation mechanism whereby the feeding of new tape is mechanically linked to the movement of the work piece. Kucklick did not testify that any of Nagel's three design elements in isolation constitutes a trade secret (tr. 9/18/15, at 39). However, both in

his testimony at trial and in his written report, Kucklick opined that the "unique combination" of these three design elements is a trade secret.

There is no serious doubt, and the Debtors do not otherwise contend, that the three-element design constitutes a "formula, pattern, compilation, program, device, technique or process" within the ordinary meaning of those words in MUTSA § 445.1902(d). In other words, this is a type of information that can potentially make up a trade secret under the definition in MUTSA. The dispute in this case turns on whether this information bears the other statutory attributes necessary to qualify it as a trade secret within the meaning of MUTSA.

"'To be a trade secret, the information must, of necessity, be a secret.' Trade secrets do not 'encompass information which is readily ascertainable, i.e., capable of being acquired by competitors or the general public without undue difficulty or hardship.'" Dura Global Techs., Inc. v. Magna Donnelly Corp., 662 F. Supp. 2d 855, 859 (E.D. Mich. 2009) (quoting Kubick, Inc. v. Hull, 224 N.W.2d 80, 87 (Mich. Ct. App. 1974)). "'[I]nformation in the public domain,'" such as through a patent, cannot be a trade secret. Giasson Aerospace Sci., Inc. v. RCO Eng'g, Inc., 680 F. Supp. 2d 830, 841 (E.D. Mich. 2010) (quoting Hickory Specialties, Inc. v. Forest Flavors Int'l, Inc., No. 99-5003, 2000 WL 687681, at *5 (6th Cir. 2000)).

Kucklick opined that Nagel's three-element design is not "generally known" or "readily ascertainable." Kucklick's written report does not explain precisely what information he looked at to arrive at this conclusion, but he did testify at trial that he "conducted Google searches with a number of search terms, superfinish, Nagel, . . . a number of terms," and that during his search, he "did not come up with a single photograph depicting a Nagel tape feeder" (tr. 9/18/15, at 63). Nor did he find any pictures that would enable an engineer to "reverse engineer" Nagel's three-element

design just by looking at a picture. He also testified that he searched "Society of Manufacturing Engineering Available Reports" (tr. 9/18/15, at 63). From these searches, Kucklick "concluded that there is not sufficient publicly available information about this design" (tr. 9/18/15, at 63). Kucklick also testified that he conducted a patent search, but did not find the three-element design disclosed in any patent. In sum, Kucklick testified that "the basis of my opinion is the - I've done the work. I've looked for material. I couldn't find it" (tr. 9/18/15, at 64).

On cross examination, Kucklick acknowledged that he did not review any of the circumstances surrounding the creation of the three-element design, but instead assumed that Nagel owns it (tr. 9/18/15, at 101). Further, Kucklick admitted that he did not keep records of any of the searches that he performed, nor could he remember how many searches he performed other than to say that "there were quite a few" (tr. 9/18/15, at 91). He also acknowledged that he did not keep a record of any of the patent numbers that he searched. And he conceded that, in any event, none of the patent or internet searches that he testified to at trial, nor the results of those searches, were disclosed in his written report (tr. 9/18/15, at 97). Kucklick also conceded on cross examination that he did not speak to any of Nagel's customers to ascertain whether Nagel's three-element design was generally known. Nor did he go to any of their facilities (tr. 9/18/15, at 108). And, except for one conversation at a large trade show in 2014, Kucklick admitted that he did not speak to any of Nagel's competitors to ascertain whether Nagel's three-element design was known outside of Nagel's business (tr. 9/18/15, at 110). Ultimately, Kucklick agreed during cross examination that he "really can't be sure exactly what . . . [he] considered" (tr. 9/18/15, at 97) when he opined that Nagel's design information is not generally known or readily ascertainable.

-24-

To rebut Kucklick's opinion, the Debtors called their own expert witness, Eby. Eby holds a Ph.D. in engineering mechanics. Eby is employed by Design Engineering as a senior consulting engineer, and is a Registered Professional Mechanical Engineer in Michigan with expertise in failure analysis of mechanical systems, design analysis, mechanical design and industrial equipment. During the trial, the Court granted the Debtors' oral motion to qualify Eby as an expert in the field of mechanical engineering, machine design and mechanical systems. The Court admitted his report (ex. B) into evidence and he too testified extensively.

Eby testified that he looked at all three of Nagel's design elements, both individually and in combination (tr. 11/12/15, at 32). In contrast to Kucklick's opinion, and somewhat contrary even to his own testimony, Eby's written report focused on each of the three elements individually, rather than in combination. Eby opined that none of them constitutes a trade secret, and each of them is in the public domain. Eby explained that he found many examples of each element in patents, a trade article, demonstration videos that he obtained through internet searches and assembly drawings used in the retooling process (tr. 11/12/15, at 51-119).

Eby's report discussed several patents (exs. K-M). He testified that these patents each publicly disclose one element of the three-element design, except for one patent that publicly discloses two elements. He agreed that none of the patents that he looked at publicly disclose all three elements.[6] Eby testified that he also found a trade article (ex. D) on Nagel's website and

[6] The Debtors elicited testimony from Eby about other patents that supposedly disclose all three design elements, and about other documents (exs. J and O-S) that Eby believes show all three design elements. Nagel objected to this testimony and these documents because Eby did not discuss them in his report as including all three design elements. Nor did Eby supplement his report as required by Fed. R. Civ. P. 26(e). Fed. R. Civ. P. 37(c)(1) provides that if a party fails to provide information as required by Rule 26(e), the party is not allowed to use that information at trial unless the failure was substantially justified or harmless. Here, the Debtors

through a Google search, which included a photograph of part of a Nagel machine (tr. 11/12/15, at 81-82). Eby testified that the picture disclosed the one sided design, but admitted that he could not tell what kind of tape actuation mechanism was actually used in the machine, or even what side it was mounted on (tr. 11/13/15, at 20-22). Eby also described some videos that he found through internet searches that show a one sided design, but conceded that they do not show all three elements of the three-element design. Further, Eby admitted that he found no video showing how a Nagel superfinishing machine works in actual operation (tr. 11/13/15, at 63-64). Eby also relied on retooling assembly drawings, but he admitted that he was only aware of two such drawings (ex. DD) of a Nagel tape finishing arm, which he understood were provided to RnD by Linamar (tr. 11/12/15, at 192). According to Eby, the assembly drawings clearly show a one sided plate design, a one way clutch and a mechanical linkage between the movement of the tooling and the indexing of the tape. Eby had no first hand knowledge as to where RnD or Digue obtained the drawings (tr. 11/13/15, at 6), and admitted that he did not ask Linamar, or any other Nagel customer, about their practice of disseminating Nagel's drawings (tr. 11/13/15, at 41).

Nagel elicited testimony from Keshavan and McNamara about whether Nagel's three-element design was generally known or readily ascertainable. Keshavan testified that Nagel project managers have access to assembly drawings and some older mechanical drawings (tr. 9/16/15, at 66-67). According to Keshavan, the only employees at Nagel who have access to all mechanical drawings are the mechanical engineers (tr. 9/16/15, at 68). Keshavan added that Nagel gives its

---

did not demonstrate that the failure was substantially justified or harmless. Therefore, the Court sustains Nagel's objection and excludes both Eby's testimony about these documents and the documents themselves (exs. J and O-S).

customers only assembly drawings and other basic information about the machines it ships (tr. 9/17/15, at 59).

McNamara testified that Nagel obtained the three-element design from a company known as Nagel Germany, but did not indicate what relationship, if any, that company has to Nagel (tr. 9/22/15, at 18). McNamara explained that Nagel gives its "assembly drawings and part touching drawings" to its customers when it ships a machine, so that the customer can maintain the equipment and reorder parts for it when needed, but does not give customers detailed drawings from which its customers could build a machine from scratch (tr. 9/22/15, at 12). McNamara estimated that since Nagel began using the three-element design in 2003, Nagel has sold approximately 70 superfinishing machines with the three-element design to about 30 different companies (tr. 9/22/15, at 18).

MUTSA § 445.1902(d)(I) also requires that a trade secret derive independent economic value from its secrecy. "To have independent economic value 'the secret information must afford the owner a competitive advantage by having value to the owner and potential competitors.' In other words, information has independent economic value if it 'would be useful to a competitor.'" Giasson Aerospace v. RCO Eng'g, 680 F. Supp. 2d at 843 (quoting Daimler-Chrysler Servs. N. Am., LLC v. Summit Nat'l, Inc., 289 Fed. Appx. 916, 922 (6th Cir. 2008)) (other citation omitted). "[S]ecret information has independent economic value '[i]f an outsider would obtain a valuable share of the market by gaining [the] information.'" Id. (quoting Electro-Craft Corp. v. Controlled Motion, Inc., 332 N.W.2d 890, 900 (Minn. 1983)).

Kucklick's report (ex. 163) states that "Nagel derives independent potential and economic value from the Nagel design information," but offers no analysis. At trial, Kucklick elaborated that the three-element design has value to a start-up company like RnD because it "very quickly" enabled

RnD "to design these machines and offer them for sale and deliver them" (tr. 9/18/15, at 64). On cross-examination, Kucklick acknowledged that in rendering his opinion as to the value of Nagel's three-element design, Kucklick did not actually speak to any customers or competitors of Nagel (tr. 9/18/15, at 100), nor did he look at any records, nor have any idea as to how much money Nagel spent in developing its trade secrets (tr. 9/18/15, at 106).[7]

Keshavan and McNamara both testified as to the value of the three-element design. Keshavan testified that Nagel's archived drawings containing the three-element design are "extremely valuable" because customers often purchase duplicate machines (tr. 9/16/15, at 148-49). McNamara prepared a chart (ex. 149) that purports to show Nagel's net profits totaling $2,347,697.75 on all of the superfinishing machines that Nagel shipped from January 1, 2010 through May 31, 2015. According to McNamara, these net profits are proof that Nagel's three-element design has value. McNamara did not elaborate on how these profits were derived from Nagel's three-element design being secret, or what would be the value of the three-element design to a competitor in terms of its profits or market share.

Under MUTSA § 445.1902(d)(ii), a trade secret must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Citing Michigan case law, the District Court for the Eastern District of Michigan described the types of efforts that are required to reasonably expect to keep information secret as including

> "either an express agreement between the employer and employee restricting or prohibiting disclosure by the latter to third parties; a disclosure by employer to employee in confidence or with a tacit understanding, inferable from the attendant circumstances, that the information is confidential; or security precautions utilized

---

[7] Eby testified that he was not asked to form an opinion on this issue (tr. 11/12/15, at 182).

by the employer to insure that only a limited number of authorized individuals have access to the information."

Wysong Corp. v. M.I. Industries, 412 F. Supp. 2d 612, 626 (E.D. Mich. 2005) (quoting Kubik, Inc. v. Hull, 224 N.W.2d 80, 87 (Mich. Ct. App. 1974)).

To prove that it made reasonable efforts to maintain the secrecy of its three-element design, Nagel again relied on the testimony of Kucklick, Keshavan and McNamara. Kucklick's report (ex. 163) unequivocally concludes that "Nagel took reasonable efforts to maintain the secrecy" of its three-element design. The problem with this conclusion is that Kucklick's report does not describe any efforts taken by Nagel to maintain secrecy. The sole support for this conclusion cited in his report is that Smarch, who did not testify at trial, signed a declaration, which was not produced at trial, asserting that Nagel only sends assembly drawings, not design drawings, when it sells a machine. That's it. When asked at trial whether Nagel takes any specific steps to maintain secrecy, Kucklick testified only that Nagel has password protection of its servers, including in engineering (tr. 9/18/15, at 79). Kucklick acknowledged that Nagel does not require its employees or independent contractors to sign non-disclosure agreements. And he admitted that in contrast to Nagel, his own company, Hess, required all of its employees to sign non-disclosure agreements to ensure that Hess's trade secret information was not disclosed (tr. 9/18/15, at 26). Kucklick did not reconcile why it was reasonable for Hess to require such agreements, yet it was also reasonable for Nagel not to do so.[8]

Keshavan testified that there is an "expectation" of confidentiality among Nagel employees. Further, Keshavan testified that there is also an "expectation" of confidentiality among Nagel's

---

[8] Eby testified that he was not asked to form an opinion on whether or not Nagel's effort to maintain secrecy were reasonable (tr. 11/12/15, at 179).

customers, and that there is a "mutual understanding that all the Nagel information will be held in confidence" (tr. 9/16/15, at 63). Keshavan could not identify precisely what information is expected to be treated as confidential, and what information is not expected to be treated as confidential and, at one point, he even testified that "*any* information that is received by a customer is confidential" (tr. 9/17/15, at 70) (emphasis added).

McNamara shared Keshavan's generalized sense that information at Nagel is to be kept confidential, but he too was vague about precisely what information Nagel considers to be confidential. McNamara testified that Nagel makes no distinction between trade secrets and other confidential information, and basically treats them all the same way (tr. 9/22/15, at 7). McNamara also testified that "just working at Nagel it becomes well known that *all* information is to be kept in confidence" (tr. 9/22/15, at 7) (emphasis added). McNamara explained that when new individuals are hired at Nagel, they are "told right up front" about the "importance of the confidential information they may come into contact with during their employment" (tr. 9/22/15, at 5).

Keshavan and McNamara provided very little foundational testimony to corroborate their belief that there is an "expectation" of confidentiality that is shared by employees, vendors, customers or others in Nagel's industry. More importantly, they provided even less evidence that Nagel takes any affirmative steps to maintain the secrecy of its three-element design. They produced no documents showing any written company policy at Nagel regarding who is given access to Nagel information, either internally or externally. The only actual measures that Keshavan identified are that Nagel quotes are maintained on a password protected server (tr. 9/16/15, at 57), Nagel does not disclose information in its quotes either to third parties or in any marketing materials

-30-

(tr. 9/16/15, at 58), and Nagel quotes (exs. 5, 28, 30, 43 and 44) are marked "confidential" in the lower left-hand corner.

For his part, McNamara agreed with Keshavan that Nagel's electronic files are only accessible to those with a user ID and a password (tr. 9/22/15, at 7), adding that when an employee leaves Nagel, access to Nagel's electronic files is terminated on their last day of employment (tr. 9/22/15, at 15). McNamara also stated that visitors to Nagel's business premises must sign a sheet (ex. 180) when they arrive and are not given unfettered access to everything on the premises (tr. 9/22/15, at 13-14), and pointed out that Nagel's marketing materials contain generic information, primarily relating to the capability of a superfinishing machine as opposed to more detailed design information (tr. 9/22/15, at 16). Finally, McNamara noted that Nagel guards its machines at trade shows and does not permit close inspection or photographs.[9]

When asked "how much time and money Nagel spends protecting its confidential information and enforcing its guidelines regarding confidential information," McNamara estimated that he spends about 5% of his time, Nagel's quality manager spends about 20% of his time, Nagel's IT manager spends about 20% of his time and Nagel's engineering department spends about 10% of its time protecting Nagel's confidential information (tr. 9/22/15, at 20). Altogether, McNamara

---

[9] Digue disagreed with McNamara's characterization of what Nagel did at trade shows, based on his experience attending the International Machine Trade Show in Chicago in 2008 and 2010 on behalf of Nagel. In 2008, Nagel exhibited one arm of a superfinishing machine similar to exhibit 161. Digue did not know who set up the machine as it was already in place when he got there. He was not given any guidance about company policy on allowing visitor access to the display other than to be cordial and to not explain the specific working of the arm. Digue testified that he demonstrated to visitors what the machine did and had examples of polished parts on display. In 2010, Nagel exhibited a full polishing machine and a honing machine. Both machines were already installed and connected when Digue arrived. Although there was an enclosure around the machines, there were windows that allowed visitors to see inside, with the inside of the machines illuminated (tr. 11/13/15, at 140-46).

estimated that Nagel has spent $1.2 million on protecting its confidential information since January, 2011 (tr. 9/22/15, at 20), but he did not explain what he or any of these other individuals actually *do* to maintain the secrecy of Nagel's confidential information, nor break down what Nagel spent the $1.2 million on.

Nagel's evidence of its policies about protecting its assembly drawings given to customers was similarly vague and non-specific. Keshavan testified that customers are provided with assembly drawings, usually in electronic format, when machines are shipped to them (tr. 9/17/15, at 60), and that the "information is not generally disseminated to the public" (tr. 9/16/15, at 151). However, Keshavan did not know whether Nagel has any policy that requires its customers to sign a non-disclosure agreement before Nagel releases drawings to its customers (tr. 9/17/15, at 63). Further, while Keshavan testified that Nagel does not provide drawings to customers when the customer is having a machine re-tooled by a competitor, he did say customers can request old assembly drawings and Nagel will provide them for a fee. Neither Keshavan nor McNamara could say whether Nagel has ever asked a customer to return drawings or whether it has returned drawings back to customers after it does a retooling job. The record is silent as to whether Nagel takes any affirmative measures to protect or monitor the secrecy of its drawings once they are provided to customers.

Most significantly, Keshavan and McNamara could not point to any efforts that Nagel ever made to prevent Digue or, for that matter, any of its employees or independent contractors, from disclosing information about the three-element design. Both Keshavan and McNamara agreed with Digue's testimony that Digue was never asked to sign a non-disclosure agreement of any kind – not when he first came to Nagel as an employee in 1997, not when he returned to Nagel as an

independent contractor in 2004, and not when he became a project manager in 2007. Digue testified without contradiction that he was never asked to keep Nagel's three-design element in confidence, and that he was not asked to refrain from disclosing it even when he left Nagel. No one at Nagel bothered to interview Digue when he left Nagel, much less ask him to keep Nagel's three-element design confidential.

Keshavan and McNamara also both testified that when Digue first came to work for Nagel, Nagel did not require any of its employees to sign a non-disclosure agreement. They also agreed that even by the time that Digue left Nagel in 2011, Nagel still did not have its employees sign non-disclosure agreements, and that Nagel did not require customers to sign any type of non-disclosure agreement. McNamara conceded that only after the dispute arose between Nagel and Digue during 2013, did Nagel begin requiring any employees to sign non-disclosure agreements, and even then it did so only for new hires.

To recap, a review of the record makes it clear that Nagel adduced evidence with respect to each of the requirements for a trade secret under MUTSA § 445.1902(d). Nagel's evidence on some of those requirements was uncontroverted. Nagel proved that the three-element design is a type of information that Nagel has successfully used to sell superfinishing machines in a competitive, niche market. But Nagel's evidence on other requirements conflicted with the Debtors' evidence – for example, whether the three-element design is really a secret. Kucklick, Keshavan and McNamara all say that it is. Eby and Digue say that it is not. Further, Nagel's evidence on another requirement – whether it derives value from the secrecy of the three-element design – while not directly controverted by the Debtors, lacked probative value since it focused almost exclusively on the historical value of the three-element design to Nagel, rather than the value that Nagel derives by

not having this information known to competitors. The only Nagel witness who testified at all as to the value of the three-element design to competitors was Kucklick, but his logic was circular, concluding only that there must be value to it because otherwise Digue would not have misappropriated it. Significantly, there was no evidence from which the Court could find that any Nagel competitor could derive any value from Nagel's three-element design by using it to sell machines or to gain market share. But regardless of how the Court weighs and resolves any conflicts in the evidence as to whether the three-element design is truly secret and whether Nagel derives value from its secrecy, the record reveals a fatal flaw in Nagel's case in chief: the lack of probative evidence that Nagel's efforts to maintain the secrecy of its three-element design are reasonable under the circumstances.

The Court gives no weight to Kucklick's conclusory statement that Nagel's efforts were reasonable because it is directly contradicted by testimony from Digue, Keshavan and McNamara. Digue testified that from the time he came back to Nagel in 2004 as an independent contractor until he resigned in 2011, Nagel never asked him to sign a non-disclosure agreement or acknowledge that he is bound by any written policies of confidentiality that apply to employees. Digue testified without contradiction that no one at Nagel even spoke to him about confidentiality either while he was a project manager for Nagel or when he left Nagel.

The testimony of Keshavan and McNamara reveals that despite Nagel's "expectation" of confidentiality, Nagel took surprisingly few concrete measures to keep secret its three-element superfinishing machine design. There is no evidence in the record that Nagel has ever required an employee or independent contractor to sign a non-compete agreement. More telling, until 2013, Nagel did not require a non-disclosure agreement from *any* of its employees or independent

-34-

contractors, not just Digue.[10] Even though Nagel has sold approximately 70 superfinishing machines to over 30 customers since 2003, there is no evidence in the record to show even a single instance prior to 2013 where Nagel requested an employee, independent contractor, customer, vendor or competitor to sign any agreement to hold any of Nagel's information in secret. Not one. It is true that Nagel offered into evidence two non-disclosure agreements (exs. 7 and 58). However, these were not agreements requested by Nagel; they were instead requested by Nagel customers. Similarly, there is no evidence that Nagel documented any company policy regarding the disclosure of information about its superfinishing machines when they were displayed at trade shows widely attended by customers and competitors.

There are only two documents in evidence that even remotely resemble affirmative measures by Nagel to keep any of its information confidential. The first is Nagel's employee handbook (ex. 1), which includes within the description of "inappropriate" conduct, a failure to "maintain the confidentiality of Nagel, customer, or client information." But Nagel admits that it did not require Digue to acknowledge the employee handbook when he returned to Nagel as an independent

---

[10] In its post-trial brief, Nagel argues that its new policy of requiring employees to sign non-disclosure agreements is inadmissible under FRE 407 to "prove that Nagel's prior policies were defective." Nagel is incorrect. That rule applies when subsequent measures are taken that would have made an earlier injury or harm less likely to occur. In those circumstances, the rule prohibits the admission of such evidence to prove negligence, culpable conduct, defective products or designs or a need for a warning or inspection. The rule expressly permits the admission of evidence of subsequent measures for other purposes, including to prove "the feasibility of precautionary measures." In this case, the evidence of the change in Nagel's policy concerning the use of non-disclosure agreements is not being offered to prove Nagel's culpability, for the purpose of making a claim *against* Nagel. Instead the evidence in being offered with respect to a claim *asserted by* Nagel, namely, to prove that the measures taken by Nagel were not sufficient or reasonable in the circumstances to entitle Nagel to a claim under MUTSA. This is not a prohibited purpose for its admission. Nagel's objection under FRE 407 is overruled.

contractor in 2004, contrary to what it did when Digue first came to Nagel as an employee in 1999. The second document, the Visitor Safety Instructions (ex. 180), is the sign in sheet for visitors to Nagel's business premises. By signing it, visitors agree "to maintain confidentiality [of] documents, data, specifications, information and knowledge which become accessible to" them. While the sign in sheet is at least some attempt to document confidentiality, it is limited to visitors at Nagel's premises. Moreover, there is no evidence of who actually visited Nagel's facilities or whether the Visitor Safety Instructions were enforced by Nagel.

The record shows that information regarding Nagel's three-element design was made available to employees, customers and even competitors without any tangible security precautions implemented by Nagel. More specifically, the record shows that Nagel made no efforts to have Digue keep this information secret. Nagel had no written or verbal agreement with Digue to keep any Nagel information secret. Nagel could not point to a single conversation with Digue about secrecy, let alone that it had some sort of "tacit understanding" with Digue. The evidence demonstrates that Nagel's efforts to maintain the secrecy of its three-element design are woefully inadequate and unreasonable under the circumstances. Nagel's generalized expectation that anyone – employees, independent contractors, vendors, customers and competitors – who comes in contact with information about Nagel's three-element design will hold such information in confidence is not based on actual measures that Nagel takes. Nagel's expectation may be sincere, but it is plainly not reasonable. Therefore, Nagel's three-element design does not qualify as a trade secret under MUTSA, and the Court need not discuss Nagel's evidence of misappropriation and unauthorized use.

## 2. Nagel's sales process

Kucklick described what makes up Nagel's sales process in very broad terms. His report (ex. 163) describes it as including "customers' entire streams of correspondence and inquiries"; Nagel's customer "contact list; pricing information; written and verbal correspondence"; "quotations, specifications and correspondence;" "proposal fonts, proposal organization, layout and appearance"; "customer historical purchases of Nagel machines"; and "Mr. Digue's knowledge of Nagel's products and services."

Keshavan and McNamara were a little more specific, and focused on two parts of the sales process. First, Keshavan explained that Nagel quotes have a certain "look and feel." Second, both McNamara and Keshavan testified about customer lists at Nagel. Keshavan acknowledged that there is no such thing as a "central customer list" at Nagel (tr. 9/17/15, at 44). Instead, Keshavan explained that each Nagel project manager has their own customer contact list that they maintain in a Microsoft Outlook file, which contains various types of information regarding Nagel's existing customers, potential customers, contact persons at the customers, and any other piece of information that might be useful in dealing with the customers.

In contrast to the three-element design, there is a substantial question as to whether customer lists and similar types of sales information are the type of information that can ever qualify as a trade secret under MUSTA.[11] Ultimately, the Court does not express a view on this issue because, just

---

[11] Generally speaking, Michigan courts are hesitant to afford a customer list the status of a trade secret. As the court in McKesson Medical-Surgical Inc. v. Micro Bio-Medics, Inc. stated:

> In this Court's opinion, customer lists developed by the employee are not protectable "trade secrets." To the extent that the list of customers accumulated by the employee includes "needs of customers" as learned by the employee

-37-

as with the three-element design, Nagel has not proven that its sales process bears the other attributes of a trade secret under MUTSA.

Keshavan testified that Nagel's sales process is not generally known outside of Nagel's business. Keshavan also stated that the customer lists have value because they have more than just the names of customer contact persons, and describe their past experiences and other information about who is doing the purchasing for a customer and who should be contacted (tr. 9/16/15, at 146). McNamara testified that the value of the sales process "is reflected in our machine sales, our revenue" (tr. 9/22/15, at 21). McNamara described Nagel's profits from 2010 to 2015 as being in excess of $2.3 million (tr. 9/22/15, at 22). Kucklick testified that Nagel's sales process is not publicly available (tr. 9/18/15, at 70), not generally known and not readily ascertainable by proper means (tr. 9/18/15, at 78-79). Kucklick concluded that Nagel's sales process information would have "tremendous value" to competitors (tr. 9/18/15, at 78).

Regarding Nagel's efforts to keep its sales process secret, Keshavan testified that he kept his customer list inside a password protected server (tr. 9/16/15, at 209), but he did not describe any other actions that he or Nagel took to keep his customer list secret. When Keshavan left his employment at Nagel in 2007, he returned his customer list to Nagel. Once he left, Keshavan was

---

during the course of his employment, such information is not protectable as a "trade secret." It is, however, protectable under an agreement in which the employee agrees not to disclose such information.

McKesson Medical-Surgical, Inc. v. Micro Bio-Medics, Inc., 266 F. Supp. 2d 590, 596-97 (E.D. Mich. 2003) (citing Hayes-Albion v. Kuberski, 364 N.W.2d 609 (Mich. 1984)); see also Nedschroef Detroit Corp. v. Bemas Enters. LLC, 106 F. Supp 3d 874, 885, n.3 (E.D. Mich. 2015) (noting that "[t]he Michigan Supreme Court has held that 'there is nothing improper in an employee establishing his own business and communicating with customers for whom he had formerly done work in his previous employment'") (quoting Hayes-Albion, 364 N.W.2d at 615).

-38-

"pretty much out of the picture," and did not know who had access to the file (tr. 9/16/15, at 219). McNamara did not identify any measures that Nagel took to have its employees or independent contractors sign non-disclosure agreements until after Nagel's dispute with Digue in 2013, when McNamara explained that "we felt it was important to put it in writing" (tr. 9/22/15, at 6).

Kucklick testified that Nagel takes reasonable efforts to maintain the secrecy of its sales process information (tr. 9/18/15, at 79), but offered no detail. Kucklick's report (ex. 163) states, without explanation, that "Nagel's efforts to protect its customer information were reasonable under the circumstances to maintain its secrecy."

Before weighing Nagel's evidence regarding its sales process, and before examining any contrary evidence adduced by the Debtors, the Court must first consider a point raised by Nagel in its post-trial brief. Nagel argues that the Court must allow its MUTSA claim with respect to its sales process because the Debtors did not rebut by any expert testimony Kucklick's expert testimony that Nagel's sales process is a trade secret that the Debtors misappropriated. It is true that the Debtors did not ask the Court to qualify Eby as an expert regarding the sales process in Nagel's industry. And Eby did not offer any expert testimony on this subject.[12] But the Debtors argue that it does not follow that the Court must accept all of Kucklick's testimony. The Debtors urge the Court to reject Kucklick's expert testimony regarding Nagel's sales process because it is not supported by a sufficient foundation.

Fed. R. Evid. 702 governs testimony by experts.

The testimony must be "based on sufficient facts or data" and "the product of reliable principles and methods[.]" Fed. R. Evid. 702(b)-(c). The expert then must 'reliably

---

[12] Eby testified that he was not asked to form an opinion on whether or not Nagel's sales process was a trade secret (tr. 11/12/15, at 180-82).

-39-

appl[y] the principles and methods to the facts of the case."  Fed. R. Evid. 7002(d). . . .

. . .

"The task for the [trial] court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." In re Scrap Metal Antitrust Litig., 527 F.3d 517, 529-30 (6th Cir. 2008).

Synergeering Group, LLC v. Jonatzke (In re Jonatzke), 478 B.R. 846, 862 (Bankr. E.D. Mich. 2012) (footnote omitted).

"'The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Antioch Co. Litigation Trust v. Morgan, __ Fed. Appx. __, 2015 WL 7755667, at *3 (6th Cir. Dec. 2, 2015).  "When determining whether an expert's testimony is reliable, the court may consider the factual basis for the expert's opinion." Ellipsis, Inc. v. The Color Works, Inc., 428 F. Supp. 2d 752, 759 (W.D. Tenn. 2006).  "Courts should confirm the factual underpinnings of the expert's opinion are sound . . . ." Id. at 760 (internal quotation marks and citation omitted).

"It is well established that an expert witness's testimony is not helpful where the jury has no need for an opinion because it easily can be derived from common sense, common experience, the jury's own perceptions, or simple logic." Jones v. Pramstaller, 874 F. Supp. 2d 713, 720 (W.D. Mich. 2012) (internal quotation marks and citation omitted).  In addition, "[i]f an expert witness relies 'solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" Antioch Co. Litigation Trust v. Morgan, 2015 WL 7755667, at *3 (quoting Fed. R. Evid. 702 advisory committee notes to 2000 amendments).

Given the Court's duty to examine the reliability of the foundation on which expert opinions are based, the Court need not uncritically accept Kucklick's testimony.  At the trial, the Court found

-40-

Kucklick to be qualified as an expert. But after reviewing his report and listening to his testimony, it is apparent that Kucklick's opinions lack solid foundation. The materials on which he relied consist primarily of trial materials filed in this Adversary Proceeding and the State Court Case. Out of the 62 documents identified in exhibit B to Kucklick's report (ex. 163), only four are non-trial documents. Those four documents consist of one patent, one patent application, a 1940 article and a 1996 catalog. Despite his assertion that Nagel's sales process is not publicly available, Kucklick testified that he did not undertake any investigation to actually determine whether the information in Nagel's customer lists is publicly available (tr. 9/18/15, at 156-57), other than to search LinkedIn (tr. 9/18/15, at 78). When asked whether Nagel has any policy as to where its project managers must keep or maintain their customer lists, Kucklick said "I don't know" (tr. 9/18/15, at 157).

Most glaringly, Kucklick never explained, either in his report or while on the stand, the basis for his opinion that Nagel took reasonable steps to maintain the secrecy of its sales process. The only specific effort that he identified at all was that Nagel's servers are password protected (tr. 9/18/15, at 79). Kucklick did not explain how that would stop employees or project managers from discussing or sharing the contents of their computer files with others. When asked about the importance of having a sales representative sign a non-disclosure agreement, as he did at Hess, his own company, in contrast to Nagel's practice of not having its sales representatives sign a non-disclosure agreement, Kucklick's answer stretched credulity: "In my experience, it doesn't make any difference" (tr. 9/18/15, at 74). Kucklick then asserted that Nagel "takes all the normal and traditional steps" to maintain the secrecy of its sales process (tr. 9/18/15, at 79).

It is true that the Debtors did not offer expert testimony to rebut Kucklick's testimony about Nagel's sales process. However, in light of the conclusory nature of much of Kucklick's expert

testimony concerning Nagel's sales process, the Court agrees with the Debtors that Kucklick's expert opinion about Nagel's sales process is entitled to little weight because it lacks foundation. The Court will consider Kucklick's testimony along with the other evidence in the record, but will not simply "take his word for it" that Nagel's sales process is a trade secret.

Much like the situation regarding Nagel's three-element design, Nagel adduced some evidence – consisting largely of conclusory statements by Keshavan, McNamara and Kucklick – to support Nagel's claim that its sales process is not generally known, and that Nagel derives value from its secrecy. But Nagel's evidence regarding its sales process suffers from the same weakness as its evidence regarding its three-element design: an absence of any meaningful steps to maintain the secrecy of its sales process. Aside from not requiring a non-disclosure agreement from its employees or project managers, including Digue, there is no evidence in the record that anyone at Nagel ever even spoke to Digue about keeping Nagel's sales process confidential, not when he came back to Nagel in 2004, not when he started as a project manager in 2007, and not when he resigned from Nagel in December, 2011. When Digue left Nagel, Nagel did not conduct any exit interview with him. Digue left his laptop behind, but no one at Nagel even spoke to him about what data or documents he should return (tr. 11/13/15, at 166-67). When asked whether Nagel ever requested Digue to return his cell phone, laptop computer, documents or any information of any kind, McNamara consistently answered "I don't know" (tr. 9/22/15, at 132-33). Considering its present claim that virtually *all* information that Digue came in contact with at Nagel was confidential, Nagel was inexplicably cavalier in making sure that this information remained secret.

The evidence demonstrates that Nagel's sales process is not the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Therefore, Nagel's sales process does

not qualify as a trade secret under MUTSA, and the Court need not discuss Nagel's evidence of misappropriation and unauthorized use.

### Count II – Intentional interference with business relations

Count II of Nagel's complaint alleges that the Debtors intentionally interfered with Nagel's valid business relationships with current and prospective customers including GKN Celaya, GKN Alamance, Linamar Engicom, Linamar ILSA, Metaldyne, Arbomex, TRW Automotive, and ThyssenKrupp. Nagel claims that the Debtors intentionally interfered with these relationships by not informing Nagel of RFQs from these customers, secretly diverting their RFQs from Nagel to RnD, providing these customers with quotes on behalf of RnD, accepting purchase orders on behalf of RnD and falsely informing these customers that Nagel was no longer in the superfinishing machine business.

To establish a case of intentional interference with a business relationship in Michigan,

a plaintiff must show: (1) the existence of a valid business relationship or expectancy; (2) defendant's knowledge of the valid business relationship or expectancy; (3) intentional interference by defendant with malice and without justification causing or inducing a breach or termination of the relationship or expectancy; and (4) damages.

Brewer v. Buck, No. 243127, 2004 WL 1488663, at *3 (Mich. Ct. App., July 1, 2004) (citing BPS Clinical Labs. v. Blue Cross & Blue Shield of Michigan, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996) (on remand)). Further, "[t]o establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference." BPS Clinical Labs., 552 N.W.2d at 925 (citation omitted). "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." Id. (citation omitted).

Before examining the evidence of this claim, the Debtors argue as a matter of law that Nagel cannot have a claim for intentional interference with business relationships because any such claim is pre-empted by MUTSA. The Debtors rely on § 445.1908(1), which provides that the "act displaces conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." Nagel counters that § 445.1908(2) goes on to say that MUTSA does not displace other civil remedies that are not based upon misappropriation of a trade secret.

The Court was unable to find any Michigan state court decisions analyzing this section of MUTSA. However, in Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co., 270 F. Supp. 2d 943 (E.D. Mich. 2003), the court surveyed decisions from several other states with similar versions of the Uniform Trade Secret Act and stated "[i]n determining whether a claim is displaced, courts generally examine whether the claim is based solely upon the misappropriation of a trade secret. If so, the claim must be dismissed." Id. at 946 (collecting cases).[13] In Bliss, the court concluded that the plaintiff's claims of tortious interference with a contractual relationship and unfair competition were not pre-empted by MUTSA because the plaintiff had alleged facts other than misappropriation for these claims, including that the defendant intentionally created confusion in the marketplace. Id. at 949-50. On the other hand, the court held that the plaintiff's conversion claim was pre-empted because it centered exclusively on the defendant's alleged unauthorized use of plaintiff's trade secrets such that "removing the trade secret allegations would effectively eviscerate [plaintiff's] conversion claim." Id. at 950; see also Dana Ltd. v. Am. Axle and Mfg. Holdings, Inc., No. 10-CV-450, 2011

---

[13] The Giasson Aerospace court also looked to decisions outside the Sixth Circuit, and in doing so, noted that MUTSA provides that the "'act shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of th[e] act among states enacting it.'" 680 F. Supp. 2d at 840, n.5 (quoting MUTSA § 445.1909).

WL 4954061, at *3 (W.D. Mich. Oct. 17, 2011) (holding that breach of fiduciary duty and unfair competition claims were not pre-empted because the complaint alleged facts other than misappropriation of trade secrets, including that the defendants failed to protect the employer's interests, lied to the employer about removing and deleting files and solicited current employees of the plaintiff).

In this case, Nagel's claim for intentional interference with business relationships is not pre-empted by MUTSA because Nagel's claim does not rest on the same facts as the alleged misappropriation of trade secrets. Nagel's claim for intentional interference rests independently on other facts, including that while he was working for Nagel, Digue failed to inform Nagel of RFQs, secretly diverted Nagel's RFQs to RnD, falsely informed customers that Nagel no longer provided superfinishing services and issued RnD proposals to Nagel's customers that underbid Nagel's proposals. These allegations do not depend on the existence of a trade secret and are irrelevant to the question of whether Nagel has any trade secrets. The Court holds that Nagel's claim for intentional interference with business relationships is not displaced by MUTSA.

The evidence in this case easily establishes the first two elements of a claim for intentional interference with a business relationship. The evidence is uncontroverted that Nagel had valid business relationships with each of the following customers: GKN Celaya, GKN Alamance, Linamar Engicom, Linamar ILSA, Metaldyne, Arbomex, TRW Automotive and ThyssenKrupp. Based on sales that Nagel previously made to those customers, as well as RFQs that it received, Nagel also had a valid expectancy of continued business from each of these customers. As a project manager for Nagel, Digue actually worked with these customers and unquestionably knew of Nagel's business relationships and expectancies with them.

The third element is more difficult. Also, the analysis of the third element is different as applied to Digue's conduct prior to December 2, 2011 – while he was working as a project manager for Nagel – and as applied to his conduct after December 2, 2011 – when he resigned as a project manager for Nagel. The Court will first consider the evidence on this element as it pertains to Digue's conduct before December 2, 2011.

The evidence shows, and Digue does not dispute, that he subverted Nagel's business by secretly building a parallel business for RnD to directly compete with Nagel while he was working as a project manager for Nagel. Digue received RFQs at Nagel from GKN Celaya, GKN Alamance and TRW Automotive but did not log them into Nagel's database or notify anyone at Nagel that he had received them. Instead, Digue had RnD issue quotes in response to these RFQs. Further, while Digue did have Nagel issue quotes in response to RFQs received from Linamar ILSA, Linamar Engicom and ThyssenKrupp, he secretly had RnD issue competing quotes as well, underbidding the very quotes he issued on behalf of Nagel. By this conduct, Digue took affirmative actions before December 2, 2011, that interfered with Nagel's business relationships and expectancy of business from those customers.

Further, the evidence shows that Digue took these actions with malice and without justification. Digue admitted that he issued those quotes to Nagel customers on behalf of RnD while he was being paid to work full time as a project manager for Nagel. Digue knew that those quotes interfered with Nagel's business relationships with those customers. Digue also knew that having RnD underbid for the same projects that Nagel was bidding on would interfere with Nagel's business relationships with these customers. Digue knew that having GKN change its Nagel supplier codes to RnD would interfere with Nagel's business relationships. That is why Digue concealed all of

-46-

these and many other facts from Nagel. Digue was not motivated by a legitimate reason to build a business. If he had been so motivated, he would have left Nagel and then built his RnD business. Instead, he had an improper motive: secretly steal Nagel's business and divert it to RnD, all while being paid to work full time for Nagel.

Digue does not deny these facts, but he does offer two excuses or justifications for his conduct. First, he vaguely alluded to advice of counsel. Digue testified that he sought the advice of a lawyer for general assistance in going into business for himself and forming his LLC (tr. 11/13/15, at 86-86). Although Digue stated that he pursued some customers and obtained purchase orders in 2011 based on his lawyer's advice (tr. 11/13/15, at 155-56), Digue did not come out and say exactly what he was advised to do. He seemed to imply that he received the go ahead to secretly compete with Nagel while he was working as Nagel's project manager, using Nagel's RFQs. However, there are three obvious problems with Digue's advice of counsel excuse. Digue never outright said what legal advice he received. His testimony, such as it was, is totally uncorroborated. And, most importantly, it's not believable.

Digue's second possible excuse or justification was that he was only an independent contractor and not an employee of Nagel. However, that is a distinction without a difference. An independent contractor can intentionally interfere with a business relationship just as effectively, and do just as much damage, as can an employee. Digue's status as an independent contractor is no defense. Further, Digue's demeanor when testifying on this subject leaves no question in the Court's mind that Digue knew his conduct was wrongful at the time, without regard to whether he was an independent contractor or an employee. When asked point blank why he did not wait until after he left Nagel to quote those machines, Digue had no justification, saying only "I don't know"

(tr. 9/17/15, at 184). The record establishes that Digue's interference with Nagel's business relationships during the time that Digue worked for Nagel up to December 2, 2011 was done with malice and without justification.

The analysis of the third element – intentional interference with malice and without justification – is different for Digue's conduct after he left Nagel on December 2, 2011. There is no question from the evidence that even after Digue left Nagel, Nagel continued to have valid business relationships with its customers and had a realistic expectancy of more work from them in the future. Those customers did not leave Nagel just because Digue was no longer working for Nagel. And Digue unquestionably continued to know of Nagel's business relationships and expectation of more work from those customers. However, there is no evidence to prove that Digue *did anything* to actually interfere with Nagel's relationship with those customers once he left Nagel. McNamara testified that once Digue left Nagel in December, 2011, Nagel uncovered no evidence that Digue ever accessed Nagel's system, drawings, quotes, customer lists or email (tr. 9/23/15, at 130-31). And by April, 2012, Digue had hired Kocsis as a sales representative, who was successful in soliciting business from non-Nagel customers as well.

To be sure, the evidence clearly shows that Digue and RnD *competed* with Nagel for business after December, 2011. However, Digue was no longer working for Nagel, hiding Nagel's RFQs and diverting Nagel's business to RnD. The fact that RnD was now in competition with Nagel for business does not by itself constitute interference with Nagel's business. Digue and RnD were free to compete with Nagel once Digue was no longer working for Nagel since Nagel had never asked them to sign a non-competition agreement. "Absent an agreement not to compete, [defendant] was free, upon termination of his employment, to use his skill, experience, and general knowledge

-48-

to compete against [plaintiff] . . . ." <u>Central Cartage Co. v. Fewless</u>, 591 N.W.2d 422, 427 (Mich. Ct. App. 1998). The Debtors' competition with Nagel after December 2, 2011 does not constitute interference with Nagel's business relationships.

The fourth element is damages. The evidence proves that Nagel was damaged by Digue's conduct up to December 2, 2011. Nagel was damaged by Digue's interference by losing purchase orders that it might otherwise have gotten from GKN Celaya, GKN Alamance, Linamar Engicom, TRW Automotive, ThyssenKrupp and Linamar ILSA. Even Digue does not dispute that he was successful in several instances when he secretly submitted proposals on behalf of RnD to these Nagel customers while still working full time for Nagel. RnD got the purchase orders, not Nagel. Those facts constitute sufficient proof of damages.

Nagel has proven a claim against Digue for intentional interference with Nagel's business relationships and expectancies based on Digue's conduct while he was working for Nagel prior to December 2, 2011. However, Nagel has not proven a claim against Digue for intentional interference with Nagel's business relationships and expectancies based on Digue's conduct after Digue stopped working for Nagel in December, 2011.

### Count III – Breach of fiduciary duty

Count III of Nagel's complaint alleges that Digue was an agent of Nagel and, as such, he owed a fiduciary duty to act in the utmost good faith and interest of Nagel. Nagel alleges that Digue breached this fiduciary duty when he concealed the existence of RnD, actively solicited business for RnD from Nagel's current and prospective customers, diverted RFQs and purchase orders from Nagel to RnD and falsely informed Nagel customers that it no longer provided services requested by those customers.

-49-

In Michigan, "[a]n agent is a person having express or implied authority to represent or act on behalf of another person, who is called his principal." Stephenson v. Golden, 276 N.W. 849, 857 (Mich. 1937) (quotation marks and citation omitted). "The characteristic of the agent is that he is a business representative. His function is to bring about, modify, affect, accept performance of, or terminate contractual obligations between his principal and third persons." Id. at 858 (quotation marks and citation omitted); see also Credit Acceptance Corp. v. Dep't of Treasury, 601 N.W.2d 109, 112 (Mich. Ct. App. 1999).

"There are certain well-defined duties and liabilities which the agent owes to the principal. The agent is a fiduciary and owes to his principal the duty of good faith and loyalty. The agent is under the duty to use care, skill and diligence, and to obey the instructions of his principal." Burton v. Burton, 51 N.W.2d 297, 302-03 (Mich. 1952). "A corollary of [the law of agency] is that the law will not permit an agent to act in a dual capacity in which his interest conflicts with his duty, without a full disclosure of the facts to his principal." Sweeney & Moore, Inc. v. Chapman, 294 N.W. 711, 712-13 (Mich. 1940) (internal quotes omitted).

"'Although the parameters of this duty are not well-defined, some general rules exist. For example, an employee may take steps to establish a competing business while still employed without breaching the duty of loyalty, but the employee may not actually commence competition.'" Nedschroef Detroit Corp. v. Bemas Enters. LLC, 106 F. Supp. 3d 874, at 883 (E.D. Mich. 2015) (quoting In re Sullivan, 305 B.R. 809, 819 (Bankr. W.D. Mich. 2004)). An employee's planning and preparation "to engage in a competing business during the scope of their agency relationship with the plaintiff . . . do not by themselves state a claim for a breach of the duty of loyalty." Mike Vaughn Custom Sports, Inc. v. Piku, 15 F. Supp. 3d 735, 752 (E.D. Mich. 2015) (citations omitted).

-50-

The Debtors argue that this claim is pre-empted by MUTSA. For the same reasons explained earlier in this opinion in the discussion of Nagel's claim for intentional interference with business relationships, the Court holds that Nagel's claim for breach of fiduciary duty is not pre-empted by MUTSA. This claim does not rest solely on the alleged misappropriation of trade secrets. Nagel alleges that Digue breached his fiduciary duty when he concealed the existence of RnD, actively solicited business for RnD from Nagel's current and prospective customers, diverted RFQs and purchase orders and falsely informed Nagel's customers that it was no longer in the superfinishing business. All of Nagel's allegations of misappropriation of trade secrets could be removed from its complaint, and these allegations of wrongful conduct by Digue would still support a claim for breach of fiduciary duty. Consequently, the claim is not pre-empted by MUTSA. See Bliss Clearing, 270 F. Supp. 2d at 946; Dana Ltd., 2011 WL 4954061, at *2.

Nagel argues that Digue owed a fiduciary duty to Nagel simply by virtue of the fact that he acted as a project manager. Similarly, the Debtors argue that Digue did not owe a fiduciary duty simply because he was an independent contractor. Neither argument by itself is sufficient. Just placing a label on Digue's relationship with Nagel by calling him a project manager or agent or independent contractor does not define what makes up that relationship. To determine whether Digue owed a fiduciary duty to Nagel arising out of his relationship with Nagel, it is necessary to understand precisely what makes up and defines their relationship. There is no contract signed by Digue and Nagel. Nor is there even a document that describes what rights and obligations they have to one another. The primary evidence in the record regarding the nature and extent of their relationship consists of testimony by four witnesses describing what they understood to be the relationship.

Nagel called three witnesses friendly to Nagel to describe the relationship: Keshavan, McNamara and Kucklick. None of them negotiated or otherwise participated in making the agreement between Nagel and Digue. None of them were even present when it was made. Each of them simply told the Court what they understood that relationship to be. Keshavan explained generally what a project manager does at Nagel and what he believes are the duties of a project manager, but he did not have any personal knowledge of any of the terms of Digue's particular agreement with Nagel. McNamara acknowledged that Digue was an independent contractor and not an employee of Nagel, and explained that Nagel generally treats independent contractors and employees the same in a number of respects. However, McNamara's testimony reveals precisely how little was actually discussed by Nagel with Digue when he returned to Nagel as an independent contractor in 2004. For example, when asked what he understood Richalin Digue, LLC to be, McNamara said "I had no idea" (tr. 9/22/15, at 23). Even though McNamara issued Nagel checks to Richalin Digue, LLC based on invoices that it sent to Nagel, McNamara testified that he never asked Digue exactly what this limited liability company was or did, and instead just "assumed it was for tax purposes" (tr. 9/22/15, at 23). Kucklick also testified about his understanding of Digue's relationship with Nagel, but Kucklick's testimony simply parroted what Keshavan and McNamara had told him. Kucklick admitted that he did not speak to anyone else at Nagel, nor did he speak to Digue.

Nagel also called Digue as an adverse witness to describe his relationship with Nagel. Digue testified that when he came back to Nagel in 2004, he had discussions with two individuals at Nagel: Jim Saule and Heidi Bochsler. Neither Jim Saule nor Heidi Bochsler testified at trial, so the only evidence of what was said at that time comes from Digue. According to Digue, he explained to both

-52-

of them at that time that he wanted to "remain independent." Digue agreed at that time with Saule and Bochsler that there would not be any written agreements between Nagel and Digue, and Digue was not given or asked to comply with Nagel's employee handbook (tr. 11/13/15, at 83).

Digue does not dispute that, as a project manager, his job was to promote, market and sell Nagel superfinishing machines. He admits that he was responsible for logging in RFQs received by Nagel so that Nagel could issue quotes. Further, Digue admits that he was also responsible to prepare quotes for Nagel and to follow up with customers when a purchase order was issued. Digue testified that he worked over 40 hours per week as a Nagel project manager from 2007 through 2011, promoting, marketing and handling sales of superfinishing machines for Nagel. This was Digue's sole source of income for those years and he was well paid, averaging about $150,000.00 per year. Digue did not disagree with Keshavan's description of a project manager as the "eyes and ears" for Nagel. Digue dealt with Nagel's customers and potential customers as Nagel's representative. Digue submitted proposals to customers on Nagel's letterhead, with Nagel's logo, and signed them as Nagel's project manager.

Without question, it would have been better to have Digue's duties as a project manager spelled out in writing. But there is no genuine factual dispute in this case over what those duties were: promote, market and sell Nagel machines. Nor is there any dispute that Digue was given access by Nagel to its customer list, templates for quotes, drawings and marketing materials to help Digue do his job, interacting with Nagel's customers on behalf of Nagel, and being well paid to do so. The Court has no hesitation holding that these circumstances created a duty for Digue to be loyal to Nagel, to use the resources Nagel provided to him solely to promote, market and sell Nagel machines, for as long as he was working for and being paid by Nagel. The absence of a written

agreement between Digue and Nagel, and Digue's status as an independent contractor rather than an employee do not diminish for an instant any of these duties. The Court finds that while he was working full time at Nagel, Digue was an agent for Nagel and, during the time that he served as an agent of Nagel, he owed Nagel a fiduciary duty of good faith, loyalty and fair dealing. See Wysong Corp. v. M.I. Indus., 412 F. Supp 2d. 612, 623-64 (E.D. Mich. 2005).

Moreover, Digue's testimony leaves no doubt that Digue fully understood that he owed a fiduciary duty of loyalty to Nagel. Digue admits that he did not tell Nagel about any of his efforts to steer business from Nagel customers to RnD during the years that Digue worked as a project manager for Nagel. Digue did not tell Nagel that he failed to log all of the RFQs that he received at Nagel into Nagel's database. Digue did not tell Nagel that he issued RnD quotes rather than Nagel quotes in response to some of these RFQs. Nor did he tell Nagel that he actually submitted competing Nagel and RnD quotes in response to some of these RFQs – and had the audacity to have the RnD quote underbid the Nagel quote. The reason is obvious: Digue knew he was breaching his duties to Nagel. That's why he concealed his conduct from Nagel.

Nagel has proven a claim against Digue for breach of fiduciary duty to Nagel during the time that Digue served as a project manager for Nagel. However, once Digue left Nagel on December 2, 2011, he owed no further duty to Nagel as he was no longer acting for Nagel or being paid by Nagel. To the extent that Nagel's claim for breach of fiduciary duty exists against Digue, it is solely based on Digue's conduct up to December 2, 2011.

### Count IV – Unjust enrichment

Count IV of Nagel's complaint alleges that the Debtors have been unjustly enriched because they received benefits consisting of amounts received in connection with sales of machines that

would have otherwise been sold by Nagel. These benefits, Nagel argues, have resulted in an inequity to Nagel which demands that Nagel be made whole.

> To establish a claim of unjust enrichment, the plaintiff must show 1) "receipt of a benefit by the defendant from the plaintiff" and 2) that "it is inequitable that the defendant retain" the benefit. <u>Dumas v. Auto Club Ins. Ass'n</u>, 473 N.W.2d 652, 663 (Mich. 1991). When these elements are met, "the law operates to imply a contract in order to prevent unjust enrichment." <u>Barber v. SMH (US), Inc.</u>, 509 N.W. 2d 791, 796 (Mich. Ct. App. 1993).

<u>C.T. Charlton & Assoc., Inc. v. Thule, Inc.</u>, 541 Fed. Appx. 549, 555, 2013 WL 5433434, at *6 (6th Cir. Sept. 30, 2013).

The evidence in this case overwhelmingly establishes that Digue built RnD as a secret, parallel business to compete with Nagel, all while Digue was being well paid by Nagel to promote Nagel's sale of superfinishing machines. Digue was successful in diverting work from Nagel to RnD. It is inequitable to allow the Debtors to retain the financial benefits generated from those purchase orders obtained at Nagel's expense while Digue was working full time for Nagel.

### Amount of Nagel's allowed claim

For the reasons explained earlier in this opinion, Nagel does not have an allowed claim against the Debtors for misappropriation of trade secrets under MUTSA. However, Nagel does have an allowed claim for intentional interference with business relationships and breach of fiduciary duty and is entitled to recover the unjust enrichment improperly gained by the Debtors as a result of those claims. This section of the opinion will address the amount of Nagel's allowed claims or, in other words, its damages.

Nagel relies on the testimony of two witnesses, Keshavan and McNamara, to prove its damages. Keshavan testified that Nagel saw a drop in RFQs, quotes and purchase orders for superfinishing machines from 2011 through 2013 (tr. 9/16/15, at 201), which he attributed to

-55-

competition from the Debtors (tr. 9/16/15, at 202). However, Keshavan admitted that, as a project manager, he does not have access to Nagel's pricing, profit margins, or financial data (tr. 9/16/15, at 227), and does not have a "complete understanding" of any damage caused by the Debtors (tr. 9/16/15, at 202). Keshavan's generalized testimony corroborates Nagel's assertion that it was damaged by the Debtors, but has little probative value to assist the Court in quantifying the amount of Nagel's damages.

McNamara was Nagel's primary witness concerning damages and testified in more detail than Keshavan. McNamara acknowledged that he is not a damages expert or an accountant, and that his testimony about Nagel's damages was based solely on his experience as Nagel's finance director (tr. 9/23/15, at 7).

McNamara prepared a chart (ex. 178) ("Damages Chart") that was admitted as a summary pursuant to Federal Rule of Evidence 1006, titled "Support for Nagel Precision Inc.'s Monetary Damages (9/9/2015)." To put the Damages Chart together, McNamara testified that he looked at some Nagel quotes and purchase orders, spoke to Keshavan, had some assistance from Nagel's attorney, and looked at answers to interrogatories (ex. 182) provided by the Debtors during discovery. The Damages Chart sets forth a "grand total" of Nagel damages in the amount of $1,870,635.00, exclusive of Nagel's claim to recover attorney fees and costs. The grand total is made up of the following six separate categories:

1. $469,500.00 for "Orders received by RnD in response to quotes made before December 2, 2011."

2. $64,350.00 for "Potential orders regarding projects quoted by RnD before December 2, 2011."

3. $724,075.00 for "Orders received by RnD from previous customers in response to quotes made after December 2, 2011."

-56-

4. $385,000.00 for "Lost business opportunities and damaged good will not otherwise accounted for in other components of Nagel's lost profits."

5. $155,065.00 for "Payments made by Nagel to Digue in 2011 (faithless servant doctrine)."

6. $72,645.00 for "Defendants' unjust enrichment for additional orders received by RnD as a result of misappropriation of Nagel's trade secrets."

The first section of the Damages Chart in the amount of $469,500.00 represents Nagel's lost profits on five purchase orders that were issued to RnD because RnD quoted on these projects while Digue was still working for Nagel. The first of these purchase orders was for two tape finishing machines for GKN Celaya. Digue admitted that he submitted a quote (ex. 19) for these machines on behalf of RnD on June 22, 2011, while he was still working for Nagel, and that he did not tell Nagel about it. The Debtors' answers to interrogatories (ex. 182) admit that GKN Celaya issued purchase orders (exs. 32 and 39) in response to RnD's quote, on October 4, 2011 and December 21, 2011, in the aggregate amount of $691,460.00. McNamara estimated that this caused Nagel to lose profits in the amount of $245,000.00. McNamara believed that figure to be about 33% of the purchase order and testified that this profit margin was consistent with the profit margins that Nagel had experienced previously on other machines that Nagel sold to GKN Celaya.

McNamara performed a similar analysis for each of the other four purchase orders identified in the first section of the Damages Chart. The second purchase order listed is in the amount of $191,450.00 for a deburring machine for Linamar Engicom. Digue admitted that he submitted a quote (ex. 29) for this machine on behalf of RnD on June 30, 2011, while he was still working at Nagel, and that he did not tell Nagel about it. This is also one of the instances where Digue admitted that he also submitted a quote (ex. 30) on behalf of Nagel for the very same machine only at a higher price than the RnD quote. Linamar Engicom issued the purchase order (ex. 31) to RnD. For this

-57-

machine, McNamara estimated a 20% profit margin based on his discussions with Keshavan (tr. 9/22/15, at 68) because a 20% profit margin is typical for this type of deburring machine.  At a 20% profit margin, McNamara calculated Nagel's lost profit on this machine to be $41,000.00.

The third purchase order listed is in the amount of $229,955.00 for a tape finishing machine for GKN Alamance.  GKN Alamance wanted the same machine that Nagel built and installed at GKN Celaya.  Digue submitted a quote (ex. 26) for a tape finishing machine on behalf of RnD on September 1, 2011 while he was still working for Nagel.  Digue admitted at trial that GKN Alamance issued a purchase order to RnD in response to this quote.  In his answers to interrogatories (ex. 182), Digue admitted that RnD received a purchase order on August 28, 2012 from GKN-USA in the amount of $229,955.00 and Keshavan testified that he reviewed the documents and concluded that these were the same purchase orders (tr. 9/16/15, at 160).  McNamara estimated that Nagel lost profits on this machine in the amount of $87,500.00 based on the profit for Nagel's previous sale of the same machine to GKN Celaya.

The fourth purchase order listed is in the amount of $299,900.00 for a tape finishing machine for Linamar ILSA.  Digue submitted a proposal (ex. 42) for RnD regarding this machine on September 7, 2011 while he was still working full time for Nagel.  Like the other proposals that he submitted for RnD during this period of time, Digue basically just used Nagel's form proposal with pictures of Nagel machines, and concealed from Nagel the fact that he was submitting this proposal on behalf of RnD.  McNamara estimated that Nagel lost profits on this machine in the amount of $90,000.00 based on Nagel's past experience selling similar machines to Linamar ILSA.

The fifth and final purchase order listed in the first section of the Damages Chart is in the amount of $23,707.00 for tooling for Parker.  Unlike the situations regarding the first four purchase

orders listed in this section of the Damages Chart, McNamara testified that he did not actually see either a quote by RnD to Parker for this tooling, or a purchase order from Parker to RnD for this tooling (tr. 9/22/15, at 70). However, there is other evidence in the record to support the finding that Digue received this order before he left Nagel. The cash flow projection (ex. 53) Digue prepared for the bank includes a section for projected sales in which Digue listed a sale to Parker in the amount of $23,707.00. Digue admitted that he created the cash flow projection before he left Nagel (tr. 9/17/15, at 204). Further, this is the exact same amount the Debtors' answers to interrogatories (ex. 182) show that RnD received from Parker in March, 2012. McNamara based the $6,000.00 in damages on Nagel's average profit for tooling.

The Debtors argue that none of the amounts set forth in the first section of the Damages Chart are compensable damages for several reasons. First, Nagel does not have a monopoly on the superfinishing machine business. It competes with other manufacturers, and the customer ultimately makes the decision as to who gets the purchase order. There is no guarantee that Nagel would have gotten these purchase orders. Second, Nagel did not offer any expert testimony but relied solely on McNamara, who is neither a damages expert nor accountant. Third, McNamara's estimates of lost profits lack foundation in that they are higher than some of the profits that Nagel has previously realized on sales of similar machines. In sum, the Debtors argue that Nagel failed to prove these damages with any reasonable degree of certainty.

The Court rejects the Debtors' arguments. "'The general rule is that plaintiff may recover all damages resulting necessarily, immediately and directly from defendant's breach but may not recover such damages as are contingent, speculative or uncertain." Synergeering Group, LLC v. Jonatzke (In re Jonatzke), 478 B.R. 846, 859 (Bankr. E.D. Mich. 20120) (quoting Hayes-Albion v.

-59-

Kuberski, 364 N.W.2d 609 (Mich. 1984)). "'Certainty is doubtless very desirable in estimating damages in all cases[.]'" Id. (quoting Allison v. Chandler, 11 Mich. 542, 554-55 (1863)). But "[i]n some cases, '"the certainty requirement will be relaxed where the fact of damage has been established and the question to be decided is the extent of the damage."'" Id. (quoting Hayes-Albion, 311 N.W.2d at 228 (quoting Howard v. City of Melvindale, 183 N.W.2d 341, 345-46 (Mich. Ct. App. 1970))).

It is undoubtedly true that the customer makes the final decision on who gets the purchase order. There is no guarantee that Nagel would have gotten every one of these purchase orders. But Nagel is not required to prove a guarantee. Instead Nagel is only required to prove that it is more likely than not that it would have gotten *these* purchase orders, all of which emanated from RFQs to Nagel, quotes by RnD, and purchase orders issued to RnD. Keshavan's and McNamara's testimony convinces the Court that Nagel would have gotten these purchase orders but for Digue's actions. The absence of expert testimony is irrelevant where, as here, the non-expert testimony is sufficient to prove damages. The evidence regarding the five purchase orders in the first section of the Damages Chart establishes that Digue submitted proposals to those five Nagel customers on behalf of RnD while Digue was working for Nagel and that Digue concealed those proposals from Nagel. The evidence also establishes that Digue was successful in steering this business from these five customers away from Nagel to RnD. RnD obtained purchase orders from GKN Celaya, Linamar Engicom, GKN Alamance, Linamar ILSA and Parker. McNamara's estimates of Nagel's lost profits on the purchase orders with these five customers, while not precisely tracking every previous sale of a machine made by Nagel, are generally consistent with Nagel's past experience

and within the range of profits that Nagel historically enjoyed on similar sales.  That is a sufficient foundation.

Nagel is not required to quantify every penny of its damages with precision.  Instead, it must only show by a preponderance of the evidence that it suffered damages that are definitely attributable to Digue's wrongful conduct, and adduce enough proof to quantify those damages to a reasonable degree of certainty.  Nagel has met its burden to prove the damages described in the first part of the Damages Chart in the amount of $469,500.00.  The evidence demonstrates that these damages are attributable to and proximately caused both by Digue's intentional interference with business relationships and by Digue's breach of fiduciary duty.

The second section of the Damages Chart in the amount of $64,350.00 represents "potential purchase orders" on projects that Digue quoted for RnD while he was still working full time for Nagel.  In contrast to his testimony concerning the first section of the Damages Chart, McNamara admitted that he has not seen any purchase orders for the particular machines listed for the five customers in this section of the Damages Chart.  McNamara also testified that he has "no idea" whether any of these potential orders were ever given to RnD (tr. 9/22/15, at 71).  McNamara explained that he included them in the Damages Chart because these are all Nagel customers and Nagel historically has been successful in getting purchase orders for approximately 50% of the projects that it quotes for its customers (tr. 9/22/15, at 72).  According to McNamara, if Nagel had been given the opportunity to quote on these five projects, Nagel would likely have gotten at least two purchase orders.  Therefore, after estimating Nagel's lost profits based on its past experiences selling similar machines to these customers, McNamara reduced his estimate by one-half to reflect

-61-

Nagel's historical success rate on its quotes. By McNamara's calculation, that produced a damages figure of $64,350.00 for these potential purchase orders in this section of the Damages Chart.

The Debtors argue that the damages described in this section of the Damages Chart are not supported by the evidence. The Court agrees. Unlike the first section of the Damages Chart, this section does not describe actual purchase orders. This section is based solely on supposition. There is no evidence that any of these customers ever issued any of these potential purchase orders to any competitor let alone RnD. McNamara's sole support for the damages described in this section of the Damages Chart is his and Keshavan's assertion that Nagel generally has a 50% success rate in obtaining purchase orders on jobs that it quotes. But that assertion has little probative value when considered in the light of the rest of McNamara's testimony. McNamara readily admitted that Nagel does not have a monopoly on the superfinishing machine business; that there are other manufacturers that compete in this business with Nagel; and that the customer ultimately decides the company from which it will purchase a superfinishing machine (tr. 9/23/15, at 13). Further, when asked how many superfinishing machines were sold by all manufacturers in the last year, McNamara testified that he had "no idea" (tr. 9/23/15, at 14) and, similarly, had "no idea" how many were sold in the United States (tr. 9/23/15, at 14). Moreover, he did not even know how many superfinishing machines Nagel had sold (tr. 9/23/15, at 13). Finally, when asked if he knew even the "rough percentage" of Nagel's market share, McNamara testified again that he had "no idea" (tr. 9/23/15, at 17).

McNamara's admitted lack of familiarity with the market for sales of superfinishing machines, and Nagel's share of that market, is not fatal to the damages calculations in the first section of the Damages Chart because there is other evidence in the record that firmly establishes

that the customers described in that section solicited proposals from Nagel, then issued purchase orders to RnD for those machines in amounts that are not disputed. As a result, there is strong evidentiary support for the calculations in the first section of the Damages Chart that convinces the Court that those damages are reasonably certain and that they were proximately caused by Digue's wrongful conduct. Not so with respect to the calculations in the second part of the Damages Chart. There is no evidence in the record to show that these "potential" purchase orders were ever issued to anyone and, if so, in what amounts. Further, there is no testimony by any of Nagel's customers to indicate that the reason Nagel was not issued purchase orders for these machines was because of any conduct of Digue. McNamara's generalized testimony about Nagel's success rate, especially in light of his lack of familiarity with the market, by itself is not enough to prove these damages. The damages set forth in the second section of the Damages Chart are too speculative.

The third section of the Damages Chart in the amount of $724,075.00 represents purchase orders that RnD received based on quotes that RnD submitted after Digue resigned from Nagel. Nagel does not contend that any of the purchase orders set forth in this section of the Damages Chart were issued in response to any RnD quotes that Digue submitted while he was still working as a Nagel project manager. However, Nagel still asserts that it is entitled to damages in the amount shown. The problem here for Nagel is that it does not have a viable theory of liability to recover these damages.

If Nagel were successful in proving a trade secret claim under MUTSA, then Nagel could plausibly argue that the damages set forth in the third section of the Damages Chart were proximately caused by the Debtors' misappropriation of Nagel's trade secrets. But the Court has already held that Nagel did not prove a trade secret claim against the Debtors under MUTSA. That

-63-

leaves only three other possible theories of recovery in Nagel's complaint: Nagel's claim for intentional interference with business relationships, Nagel's clam for breach of fiduciary duty, and Nagel's claim for unjust enrichment. However, as explained earlier, Nagel failed to prove that the Debtors did anything to actually interfere with Nagel's business relationships after December 2, 2011. Further, the only fiduciary duty that Digue owed to Nagel is one that derived from Digue's work as a project manager for Nagel. When Digue ceased being a project manager for Nagel on December 2, 2011, so did his fiduciary duty. Once Digue left Nagel, the Debtors were free to compete with Nagel in the marketplace because they were not bound by any covenant not to complete. To the extent that RnD was successful in obtaining purchase orders based on proposals to customers that it submitted *after* December 2, 2011, it was not because of misappropriation of trade secrets, intentional interference with business relationships or breach of fiduciary duty. From this, it follows that the Debtors were not unjustly enriched by the post-December 2, 2011 purchase orders. Therefore, Nagel is not entitled to the damages set forth in the third section of the Damages Chart.

The fourth section of the Damages Chart in the amount of $385,000.00 represents "lost business opportunities and damaged goodwill not otherwise accounted for." McNamara testified that in this section he tried to "put a dollar amount on what we felt was damaged goodwill to our company" (tr. 9/22/15, at 59). McNamara explained his methodology as follows: Nagel looked at its quote log and noticed a decrease in RFQs and quotes for 2011 and 2012. McNamara "believed" that this was due to the Debtors' actions to mislead Nagel's customers (tr. 9/22/15, at 59) during these years while RnD was secretly competing with Nagel. McNamara then looked at the number of quotes for 2010, when RnD was not yet secretly competing with Nagel, and the number of quotes

for 2013-2015, when RnD was competing with Nagel, but not doing so secretly. From that data, McNamara inferred that Nagel should have submitted more quotes in 2011 and 2012 based on the average of the other years that McNamara looked at. In total, McNamara estimated that Nagel should have quoted on another 13 projects in 2011 and 2012. McNamara then estimated that Nagel would have likely been successful in obtaining purchase orders on seven of those additional 13 quotes. Based on Nagel's past experience with similar sales, McNamara estimated that Nagel would have realized a profit of $55,000.00 on each purchase order. At $55,000.00 per purchase order, that adds up to $385,000.00 (tr. 9/22/15, at 93-95). McNamara attributed this loss to Digue's "competing unfairly with Nagel" (tr. 9/22/15, at 105).

On cross-examination, McNamara admitted that he could not say with any certainty whether the drop in quotes by Nagel was caused by the Debtors (tr. 9/23/15, at 106). McNamara acknowledged that the drop in quotes during 2011 and 2012 could also have been due to external factors such as overall economic conditions, customer demand, or actions by Nagel's other competitors (tr. 9/23/15, at 108-09). Ultimately, when asked whether he could say with certainty that RnD was the only cause for Nagel's dip in quotes, McNamara answered, "I don't know" (tr. 9/23/15, at 11). As for the $55,000.00 estimated profit on each purchase order that it did not receive, McNamara conceded that he did not take into consideration Nagel's costs in building these machines (tr. 9/23/15, at 110).

Nagel has failed to prove the fourth section of damages in the Damages Chart by a preponderance of the evidence. McNamara's estimate in this section is at best a guess, supported only by an inference that McNamara drew from a drop in Nagel's quotes. It is certainly possible that Digue's conduct had some effect on the drop in quotes during these years, but McNamara's

testimony shows that it is equally possible that the drop in quotes was due to some other cause. That possibility looms even larger in light of McNamara's testimony that he is not at all familiar with the market for superfinishing machines, that he does not know how many are sold in the market and he does not know what Nagel's market share is. The $385,000.00 estimate for "lost business opportunity and goodwill" is speculative, and therefore is not allowed.

The fifth section of the Damages Chart in the amount $155,065.00 represents "payments made by Nagel to Digue in 2011." This sum is further described on the Damages Chart as being attributable to the "faithless servant doctrine," and is the money that Nagel paid to Digue during 2011. There was no specific testimony at trial regarding this item of damages. However, there is no factual dispute that Nagel paid this amount to Digue during 2011, as shown by Nagel's records (ex. 2). Nor is there any factual dispute that the conduct that the Court has found to be actionable as intentional interference with business relations and breach of fiduciary duty all occurred during 2011, while Digue was being paid to work for Nagel. The question of whether this is an allowable item of damages turns solely on the legal issue of whether or not there is a faithless servant doctrine under Michigan law that applies to these facts.

In Michigan, "[i]t is the generally accepted rule that an officer may forfeit all right to compensation because of fraud, misconduct or gross neglect in the management of the corporation or in the performance of his duties." <u>Toy v. Lapeer Farmers Mut. Fire Ins. Association</u>, 297 N.W. 230, 231-32 (Mich. 1941) (citations omitted) (disallowing entirely the salary claim of an insurance company's secretary-treasurer in light of the overwhelming evidence of his gross neglect of duty). The rule is based in agency, <u>id.</u> at 232, and has been applied by Michigan courts to positions other than corporate officers. For example, the executor of a probate estate "forfeited all right to

-66-

compensation" because he "manipulated the affairs of the estate to such an extent that it is impossible to determine the loss to the estate." Burnham v. Kelley, 300 N.W. 127, 132 (Mich. 1941) (relying on Toy v. Lapeer Farmers).

The Michigan Court of Appeals addressed the "faithless servant rule" in an unpublished case concerning an insurance agent. In Tooling Manufacturing & Tech. Ass'n v. Tyler, No. 293987, 2010 WL 5383529 (Mich. Ct. App. Dec. 28, 2010), the defendant "was the only insurance agent . . . and was solely responsible for negotiating with the insurers on behalf of the [plaintiff]." Id. at *2. He was paid a base salary plus commission. Some years later, he formed a corporation and had inflated commissions diverted to the corporation. Id. at *5. The same day that the defendant gave notice, stating that he was going into business for himself, the plaintiff discovered that the defendant had boxed up all of the plaintiff's files. The plaintiff sued "for misappropriating trade secrets, unfair competition, injunctive relief . . . , tortious interference with business relationships, unjust enrichment, and breach of fiduciary duty." Id. at *6. The defendant countersued for unpaid salary and commissions. After dismissing the claims for trade secrets, unfair competition and injunctive relief, the trial court found that the defendant had "wrongfully taken" over $700,000.00 in commissions owed to the plaintiff, against which it offset any salary and commissions due the defendant. Id.

In affirming, the appellate court articulated Michigan's version of the faithless agent or faithless servant rule.

> Michigan courts have long recognized that an agent may forfeit his or her right to compensation under a contract for services when the agent engages in misconduct or grossly mismanages his principal's affairs. . . . The faithless agent rule recognizes that–by being disloyal to his or her principal–the agent has not properly performed under his or her agreement with the principal and, for that reason, has no right to the compensation contemplated under the agreement. Under the faithless agent rule, an

-67-

agent who engages in misconduct will forfeit the compensation related to the service
that was improperly performed.

Id. at *7 (citations omitted); see also The Spring Works, Inc. v. Sarff (In re Sarff), 242 B.R. 620, 628

(B.A.P. 6th Cir. 2000) (relying on Restatement Agency 2d, § 469 (1958) in ruling that an

employee's actions in diverting business to a competitor "were a willful and deliberate breach of his

contract of service" and thus he was not entitled to be paid for those services).

The Court has already found that Digue intentionally and secretly built a parallel business

for RnD in direct competition with Nagel while he was working as a project manager for Nagel.  The

Court has also already found that Digue did so with malice and without justification, and in breach

of his fiduciary duty to Nagel.  Those findings are sufficient to invoke the faithless servant doctrine

under Michigan law, and to apply it to the damages in the fifth section of the Damages Chart.

McNamara included the entire amount that Nagel paid to RnD for Digue's services in 2011.

The evidence shows that Digue was certainly making plans to set up his competing business

throughout 2011, and even as early as October, 2010 (ex. 8), but he did not take any affirmative

action to implement those plans until May 4, 2011, when he diverted a Nagel RFQ for two tape

finishing machines.  Digue then submitted a proposal (ex. 19) on behalf of RnD to GKN Celaya that

resulted in RnD receiving its first purchase order in July, 2011.  When he diverted that RFQ, Digue

was no longer working for Nagel but for himself.  Nagel's records (ex. 2) show that from May 4,

2011 through December 2, 2011, Nagel paid $95,003.16 to RnD for Digue's work.  That is the

amount  of damages that Nagel is entitled to receive under the faithless servant doctrine.

The sixth and final section of the Damages Chart in the amount of $72,645.00 represents

"unjust enrichment for additional orders received by RnD as a result of misappropriation of Nagel's

trade secrets."  McNamara testified that he understands from looking at the Debtors' answers to

-68-

interrogatories (ex. 182) that RnD received purchase orders from Delta Gear and Dayco. The Debtors' answers to interrogatories do show that RnD received purchase orders in 2014 and 2015 from these two customers. McNamara estimated that RnD's profit on each of these two projects was 25% of the amount of each purchase order, resulting in the $72,645.00 amount shown on the Damages Chart. McNamara did not provide any more information about why he included these two purchase orders on his Damages Chart.

Nagel has not met its burden to prove that this is a compensable item of damages. First, this entire item of damages is based on the premise that the Debtors misappropriated Nagel's trade secrets. For reasons explained earlier in this opinion, Nagel does not have a claim for misappropriation of trade secrets under MUTSA. Second, even if Nagel did have a claim under MUTSA, McNamara's testimony estimating these damages is hopelessly unsupported. He acknowledges that it is just a guess, and admits that he has seen no data from which he could calculate RnD's profit margin on these two purchase orders or any other projects (tr. 9/22/15, at 100-01). The Court disallows this item of damages.

To summarize, out of the six sections of damages on the Damages Chart (ex. 178), the Court allows Nagel a claim only with respect to the first and fifth sections. The first section consists of damages based on actual purchase orders received by RnD in response to quotes submitted by Digue while he was working at Nagel prior to the time that he left on December 2, 2011. The $469,500.00 of damages in that section was proximately caused by Digue's intentional interference with business relationships and breach of fiduciary duty. The fifth section consists of damages based on the faithless servant rule. The $95,003.16 of damages in that section was proximately caused by

Digue's conduct as a faithless servant. The damages described in the remaining sections of the Damages Chart are not allowed for the reasons explained.

Nagel's complaint also requests attorney fees. Nagel's sole authority in support of this request is MUTSA § 445.1905, which authorizes a court to "award reasonable attorney's fees to the prevailing party." However, because the Court has denied Nagel's claim for misappropriation of trade secrets under MUTSA, § 445.1905 does not authorize the Court to award Nagel any attorney fees in this case. The Court has ruled in favor of Nagel's state law claims for intentional interference with business relations and breach of fiduciary duty, but Nagel has cited no authority that supports an attorney fee award to Nagel as the prevailing party with respect to those state law claims. As recently noted by the Supreme Court in Baker Botts L.L.P. v. ASARCO, LLC, __ U.S. __, 135 S. Ct. 2158, 2164 (2015), when a court is asked to consider an award of attorney fees, the "'bedrock principle known as the American Rule'" provides that "'[e]ach litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise.'" Id. at 2164 (quoting Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242, 252-53 (2010)). Nagel has identified no such statute or contract.[14] Nagel's request for attorney fees is denied.

Nagel filed identical proofs of claims in both of the Debtors' bankruptcy cases. The conduct on which both claims are based consists entirely of actions taken by Digue. All of those actions relate to the wrongful diversion of business from Nagel to RnD. There is no evidence in the record from which the Court can in any meaningful way separate Digue's conduct from RnD's conduct, or attempt to apportion liability between them. The evidence shows that Digue's wrongful conduct

---

[14] Nagel cannot rely on the Bankruptcy Code because "there is no statutory basis . . . that provides generally for attorney's fees for a prevailing creditor in a § 523 action." Synergeering Group v. Jonatzke, 478 B.R. at 869 (quotation marks and citation omitted).

-70-

in interfering with Nagel's business relationships and in breaching his fiduciary duty to Nagel was undertaken by him both for his own benefit and, since he was the 100% owner of RnD, for the benefit of RnD. Both Digue and RnD were unjustly enriched. In these circumstances, Michigan law warrants a finding of joint and several liability on both Digue and RnD. A defendant "who knowingly joins a fiduciary in an enterprise where the personal interest of the latter is or may be antagonistic to his trust becomes jointly and severally liable with him for the profits of the enterprise." Hayes-Albion, 364 N.W.2d at 617 (quotation marks and citation omitted). Therefore, the Court allows a claim in favor of Nagel against both Debtors, jointly and severally, in the amount of $564,503.16 (consisting of $469,500.00 from the first section of the Damages Chart and $95,003.16 from the fifth section of the Damages Chart).

### Count V – § 523(a)(2)(A)

Count V of Nagel's complaint seeks a determination that its allowed claim against Digue is nondischargeable in his bankruptcy case under § 523(a)(2)(A) of the Bankruptcy Code. Section 523(a)(2)(A) excepts from discharge a debt obtained by false pretenses, false representation or actual fraud. "Each of the three grounds for nondischargeability set forth in § 523(a)(2)(A) are independent . . . [yet] each of the grounds require a showing of positive fraud; as opposed to fraud implied in law." Adam v. Fletcher (In re Fletcher), 345 B.R. 592, 597 (Bankr. N.D. Ohio 2006) (citations omitted).

False representation requires that a debtor made a material misrepresentation, knowing it was false, and with the intent to deceive the creditor. The creditor must have justifiably relied on the representation, and its loss must have been proximately caused by that reliance. Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert), 141 F.3d 277, 280-81 (6th Cir. 1998). The failure to

disclose a material fact can form the basis of either a material misrepresentation or false pretense.

See Semaan v. Allied Supermarkets, Inc. (In re Allied Supermarkets, Inc.), 951 F.2d 718, 728

(6th Cir. 1991). "[F]raud and false representations are typically implemented more by fabrication,

explication and diversion" while "[a] false pretense is generally employed by stealth, implication,

and misdirection[.]" Evans v. Dunston (In re Dunston),117 B.R. 632, 641 (Bankr. D. Colo. 1990),

*aff'd in part and rev'd in part on other grounds*, 146 B.R. 269 (D. Colo. 1992).

> [A]ctual fraud encompasses **any deceit, artifice, trick, or design involving direct or active operation of the mind, used to circumvent and cheat another.** . . . When a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right, that debtor has engaged in actual fraud and is not entitled to the fresh start provided by the Bankruptcy Code.

Morganroth & Morganroth, PLLC v. Stollman (In re Stollman), 404 B.R. 244, 257 (Bankr.

E.D. Mich. 2009) (internal quotation marks and citations omitted) (emphasis in original).

Nagel's complaint alleges that its claim against Digue is nondischargeable under

§ 523(a)(2)(A) because it is within all three types of debts described in that subsection: false

pretenses, false representation and actual fraud.[15] Unlike a classic Rembert case – where the

§ 523(a)(2)(A) nondischargeability turns on a specific misrepresentation – the facts in this case are

more easily understood as false pretenses or actual fraud. There is plenty of evidence to show that

Digue created a false impression or a contrived and misleading understanding, that he used stealth

and misdirection, and acted deliberately and intentionally to circumvent and cheat Nagel over an

extended period of time: Digue failed to log in RFQs; submitted proposals on behalf of RnD to

---

[15] At the final pretrial conference, Digue argued for the first time that Nagel's complaint does not sufficiently plead each of these types of debts. The Court overruled this objection and found that the complaint sufficiently pled all three types of nondischargeable debts described in § 523(a)(2)(A).

-72-

Nagel's customers; used Nagel's forms and pictures to prepare the RnD quotes; misled GKN Celaya, GKN Driveline and Linamar ILSA into thinking they were getting Nagel machines; issued competing quotes on behalf of RnD in response to RFQs sent to Nagel; prepared and submitted RnD quotes that underbid Nagel quotes that he himself prepared; used the RFQs diverted from Nagel to establish RnD's creditworthiness and as the basis for RnD's first year cash flow projections in Digue's request for a line of credit from First Independence Bank; changed Nagel's supplier codes with GKN; created a fictitious RnD invoice; wrongfully held Nagel funds in RnD's bank account; hid his role in the diverted payment from GKN by issuing a cashier's check and mailing it; fostered the impression that the payment came directly from GKN; falsely told Nagel that he was moving to Texas while at the same time signing a multi-year lease for RnD in Livonia, Michigan; and failed to give notice of his leaving Nagel to the customers he was soliciting for RnD while giving notice to those he was not.

Digue did all these things secretly, never telling Nagel of his actions to divert Nagel's business. Digue was successful in diverting Nagel's business to RnD while he was supposedly working full time for Nagel, all the while drawing substantial compensation from Nagel. Digue went to great lengths to conceal his actions. One telling example is his conduct in hiding the consequences of the change in Nagel's GKN supplier code. The efforts Digue took to hide his conduct leave only one inference to be made. He knew what he was doing was underhanded and wrong. The evidence is overwhelming that Digue did all this intentionally and by deceit. Nagel justifiably relied on Digue to market, promote and sell Nagel machines during the time that Nagel was paying Digue to work full time for it as a project manager. Digue perpetrated an actual fraud on Nagel by his secret scheme to divert Nagel's business to RnD. Digue's fraud on Nagel

proximately caused Nagel damages in the amount of $564,503.16. Digue incurred this debt by false pretenses and by actual fraud. Therefore, Nagel's claim against Digue is nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code.

## Count VI – § 523(a)(4)

Count VI of Nagel's complaint alleges that its claim against Digue is nondischargeable under § 523(a)(4) which excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . ." Of these three grounds, Nagel only asserts a claim for embezzlement. "[F]or Section 523(a)(4) purposes, federal common law, rather than state law, controls the meaning of these terms." Williams v. Noblit (In re Noblit), 327 B.R. 307, 311 (Bankr. E.D. Mich. 2005). "Federal common law defines embezzlement as 'the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.'" Id. (quoting Brady v. McAllister (In re Brady), 101 F.3d 1165, 1172-73 (6th Cir.1996)).

The property that Nagel relies on for its embezzlement claim consists of its alleged trade secrets under MUTSA: Nagel's three-element design and Nagel's entire sales process. For the reasons explained earlier in this opinion, the Court holds that neither Nagel's three-element design nor its sales process constitute trade secrets under MUTSA. They are not interests in property but are just pieces of information that Digue became aware of while serving as a Nagel project manager. Nagel did not entrust any property to Digue. Therefore, Nagel's claim for nondischargeability under § 523(a)(4) fails.[16]

---

[16] One type of debt that is nondischargeable under § 523(a)(4) is a debt for fraud or defalcation while acting in a fiduciary capacity and larceny. Nagel did not plead either of these theories. Count III of Nagel's complaint pled a breach of fiduciary duty by Digue under Michigan law, but that is not the same as pleading defalcation while acting in a fiduciary capacity for purposes of § 523(a)(4). "The question of who is a fiduciary for purposes of

-74-

**Count VII – § 523(a)(6)**

Count VII of Nagel's complaint alleges that its claim against Digue is nondischargeable under § 523(a)(6) which excepts a debt for willful and malicious injury by the debtor to another entity or to the property of another entity. The elements of nondischargeability under § 523(a)(6) are (I) desire to cause the consequences of the act or belief that the consequences are substantially certain to result; and (ii) no just cause or excuse. <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61-62 (1998); <u>Kennedy v. Mustaine</u> (<u>In re Kennedy</u>), 249 F.3d 576, 580 (6th Cir. 2001); <u>Markowitz v. Campbell</u> (<u>In re Markowitz</u>), 190 F.3d 455, 464 n.10 (6th Cir. 1999) (broadening the ruling in <u>Kawaauhau v. Geiger</u> to include not only a debtor's intent to injure, but also the debtor's belief that the injury is "substantially certain to occur as a result of his behavior").

"Malice" for purposes of § 523(a)(6), was defined by the Supreme Court in <u>Tinker v. Colwell</u>, 193 U.S. 473 (1904), as "a wrongful act, done intentionally, without just cause or excuse." <u>Id.</u> at 485-86 (interpreting analogous § 17(a)(2) of the former Bankruptcy Act) (internal quotation marks and citation omitted); <u>see also</u> <u>In re Markowitz</u>, 190 F.3d at 465 n.10 (finding that "the lack of an excuse or justification for [a debtor's] actions will not alone make [a] debt non-dischargeable under § 523(a)(6)"). Alternately, malice has been defined as "act[ing] in conscious disregard of [one's] duties . . . ." <u>Qui v. Zhou</u> (<u>In re Zhou</u>), 331 B.R. 274, 277 (Bankr. E.D. Mich. 2005) (citing

---

§ 523(a)(4) is one of federal law." <u>Abdel-Haak v. Saad</u> (<u>In re Saad</u>), 319 B.R. 147, 155 (Bankr. E.D. Mich. 2004) (citing <u>Carlisle Cashway, Inc. v. Johnson</u> (<u>In re Johnson</u>), 691 F.2d 249, 251 n.2 (6th Cir. 1982)). The Sixth Circuit limits a fiduciary relationship for purposes of § 523(a)(4) to a "pre-existing fiduciary relationship," <u>Patel v. Shamrock Floorcovering Services, Inc.</u> (<u>In re Patel</u>), 565 F.3d 963, 968 (6th Cir. 2009), and to "express or technical trusts." <u>In re Johnson</u>, 691 F.2d at 251.

Nagel did not plead nondischargeability based on fraud or defalcation while acting in a fiduciary capacity, but even if it had, the proofs do not demonstrate the existence of an express trust as required by the Sixth Circuit.

Gonzalez v. Moffitt (In re Moffitt), 252 B.R. 916, 923 (B.A.P. 6th Cir. 2000) and Monsanto Co. v. Trantham (In re Trantham), 304 B.R. 298, 308 (B.A.P. 6th Cir. 2004)).

The evidence in the record proves that Digue desired to divert Nagel's business to RnD while Digue was working for Nagel. Digue admits that he submitted proposals on behalf of RnD to Nagel customers who sent RFQs to Nagel. Digue did so for the purpose of soliciting those customers to give their purchase orders to RnD, not Nagel. Digue admits that he even submitted competing bids on behalf of both Nagel and RnD, with RnD submitting the low bid to entice the customer to give the purchase order to RnD. This conduct proves that Digue intended to injure Nagel and that he fully understood that his conduct would injure Nagel.

The evidence also proves that Digue acted with malice. He wrongfully built his secret parallel business for RnD at Nagel's expense, furtively promoting and marketing sales of machines for RnD while being paid by Nagel to do so for Nagel. Digue did not offer a single credible justification or excuse for his actions during his testimony at trial. There is no doubt that Digue's actions were in conscious disregard of his duties. Therefore, Nagel's claim is nondischargeable under § 523(a)(6) of the Bankruptcy Code.

### Injunctive relief

Nagel's complaint also seeks injunctive relief against the Debtors. Specifically, Nagel requests a permanent injunction against the Debtors prohibiting them from obtaining, using, disclosing or destroying any of Nagel's trade secrets and requiring the Debtors to turn over to Nagel any documentation or information that the Debtors have in their possession, custody or control regarding Nagel's trade secrets. The sole legal authority cited by Nagel in support of this injunctive relief is MUTSA § 445.1903, which authorizes the granting of injunctive relief under certain

-76-

circumstances. However, the express predicate for injunctive relief under that statutory provision is a determination of actual or threatened misappropriation of a trade secret. For the reasons explained in this opinion, neither Nagel's three-element design nor its sales process constitute trade secrets under MUTSA. Because there are no trade secrets at issue in this case, Nagel has failed to prove that there is actual or threatened misappropriation of a trade secret, as required by MUTSA § 445.1903. Therefore, the Court denies Nagel's request for injunctive relief.

## Conclusion

Nagel's view of this case throughout the trial emphasized Nagel's belief that its three-element design for the superfinishing machines that it builds, and its process for marketing and selling those machines, are trade secrets that are not generally known and not readily ascertainable by others outside of Nagel. From the evidence at trial the Court has no doubt about the sincerity of Nagel's belief. Unfortunately for Nagel, the evidence demonstrates that Nagel's actions to protect the secrecy of this information do not warrant that belief. Nagel has been making and selling these superfinishing machines for years, to many customers. Yet Nagel has historically documented no company policy to ensure that its design and its sales process remain secret. Until its dispute with Digue, Nagel never asked its employees and independent contractors to sign agreements with Nagel to keep *any* of Nagel's information confidential, let alone *all* of Nagel's information, as it now maintains. By any measure, Nagel's efforts to maintain secrecy have not been reasonable. But that doesn't excuse Digue's conduct.

The Debtors' view of the case throughout the trial emphasized Digue's belief that he is an innovator, with a strong streak of entrepreneurial spirit and a desire to be independent. From his work at Nagel and then at RnD, it is clear to the Court that Digue has been successful in marketing

-77-

and selling machines. Because he had not signed a covenant not to compete, there is no reason why Digue could not have left Nagel to strike out on his own, innovate and build his own business to compete with Nagel and others in the marketplace. What Digue could not do, however, was pretend to work full time as a project manager for Nagel, with substantial compensation, and surreptitiously take Nagel's business for his own. Once Digue decided to build a business for RnD, he should have left Nagel. Digue admitted as much at trial when asked why he did not wait until after he left Nagel to begin having RnD compete with Nagel.

Digue's conduct in secretly building his parallel business while working for Nagel severely damaged Nagel. The Debtors are liable for that damage. Worse for Digue, the nature of Digue's conduct that creates this liability makes it a debt that is not dischargeable in his bankruptcy case.

The Court will enter a separate order consistent with this opinion.

.

Signed on March 01, 2016

 /s/ Phillip J. Shefferly
Phillip J. Shefferly
United States Bankruptcy Judge